UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
GALVESTON DIVISION

| | | |
|---|---|---|
| VOTING FOR AMERICA, INC., *et al*, | § | |
| | § | |
| Plaintiffs, | § | |
| VS. | § | CIVIL ACTION NO. G-12-44 |
| | § | |
| HOPE ANDRADE, *et al*, | § | |
| | § | |
| Defendants. | § | |

## OPINION AND ORDER GRANTING IN PART AND DENYING IN PART PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION

Broad-based participation in the political process is crucial to governmental legitimacy and the proper functioning of our constitutional system. *See* THE FEDERALIST NO. 10 (James Madison); *see also Kramer v. Union Free Sch. Dist. No. 15*, 395 U.S. 621, 626 (1969) ("Any unjustified discrimination in determining who may participate in political affairs or in the selection of public officials undermines the legitimacy of representative government."). The most elementary form of political participation is voting; thus, the right to vote is "a fundamental matter in a free and democratic society." *Reynolds v. Sims*, 377 U.S. 533, 561–62 (1964). But, in order to vote, one must first be registered, and many citizens are not registered.

This problem has been tackled on many fronts; governmental actors and private citizens alike have spent much time and treasure attempting to increase the number of Americans who are registered to vote. One of the primary means by which individuals have been able to help their fellow Americans register is what is commonly known as the voter registration drive. Voter registration drives have played a vital role in increasing participation in the political process. This is especially true in minority communities with historically lower rates of voter registration. Census figures indicate that a significant percentage of African-Americans and Hispanics voting in the last presidential election registered through voter registration drives and other third-party voter registration activities.[1]

This case concerns Texas's heavy regulation of third-party voter registration activity. For more than two decades, Texas has required those

---

[1] *See Voting and Registration in the Election of November 2008 – Detailed Tables: Table 14. Method of Registration by Selected Characteristics: November 2008*, UNITED STATES CENSUS BUREAU, http://www.census.gov/hhes/www/socdemo/voting/publications/p20/ 2008/tables.html (last visited July 24, 2012). These figures do not indicate specifically how many voters are registered during voter registration drives, but they do show the number of voters registered at a "registration booth" or at a "school, hospital, [or] campus." *Id.* These two categories are not perfect proxies for voter registration drives, but they are broadly indicative of the effect of third-party voter registration activities such as registration drives. During the 2008 General Election, 20.4% of African-American voters and 18.9% of Hispanic voters were registered at a booth or a school, hospital, or campus. For White non-Hispanic voters, the figure was 10.7%. *Id.* For those voters registered at a booth, a category which is likely the best single proxy for the effect of third-party voter registration activity, the numbers are even more stark: 11.1% of African-American voters and 9.6% of Hispanic voters were registered at a booth, compared to only 5.0% of White non-Hispanic voters. *Id.*

seeking to receive applications from prospective voters to be appointed volunteer deputy registrars ("VDRs").  During the 2011 legislative session, the Governor signed two bills that imposed a number of additional requirements.  The new laws restricted non-Texans from becoming VDRs, required VDRs to undergo training, and banned certain forms of compensation for voter registration activities.  The result is that Texas now imposes more burdensome regulations on those engaging in third-party voter registration than the vast majority of, if not all, other states.

Two organizations involved in national voter registration efforts filed this lawsuit and now seek a preliminary injunction barring enforcement of a number of the Texas laws regulating voter registration drives.  They contend that the federal National Voter Registration Act ("NVRA") preempts some of the laws.  Others, they maintain, violate the First Amendment guarantees of freedom of speech and association and the Fourteenth Amendment guarantee of due process.

In reviewing these challenges, the Court first holds that Plaintiffs have standing to bring the eight claims on which they requested preliminary relief against both named defendants—the Texas Secretary of State and the Galveston County Registrar.  Then, having reviewed the applicable statutes and case law, as well as the briefing and the evidence presented at a lengthy

injunction hearing, the Court **GRANTS IN PART** and **DENIES IN PART**
Plaintiffs' Motion for Preliminary Injunction. Plaintiffs have met the
demanding standards for a preliminary injunction on five of the eight
challenges on which they seek preliminary relief. They are entitled to a
preliminary injunction on two of their preemption challenges, those brought
against the Photocopying Prohibition and the Personal Delivery
Requirement, and on three of their First Amendment challenges, those
brought against the In-State Restriction, the County Limitation, and part of
the Compensation Prohibition.

## I.   BACKGROUND

### A.   *Procedural History*

Plaintiffs are the nonprofit organization Project Vote, its affiliate,
Voting for America (together, the "Organizational Plaintiffs"), and
Galveston County residents Brad Richey and Penelope McFadden. In May
2011, after the enactment of the new laws regulating voter registration
drives, the Organizational Plaintiffs sent a letter requesting the Secretary of
State to clarify Texas's interpretation of both the new laws and the pre-
existing scheme. After receiving a response, Plaintiffs filed suit in February
2012 challenging (1) the constitutionality and enforceability of ten
regulations that the Texas Election Code imposes on the third-party voter

registration process; (2) Galveston County's alleged unlawful enforcement of Texas's photo identification requirement for voters prior to the proper preclearance of that law under the Voting Rights Act; and (3) Galveston County's alleged failure to follow state law requiring notice to voters before suspending their registration.  Defendants are Hope Andrade, sued in her official capacity as the Texas Secretary of State (the "Secretary"), and Cheryl Johnson, sued in her official capacity as the Galveston County Tax Assessor and Voter Registrar.

The Organizational Plaintiffs filed a motion for a preliminary injunction seeking to immediately bar enforcement of most, but not all, of the Texas voter registration laws they contend are either unconstitutional or preempted.  They did not seek preliminary relief on the claims in their complaint that are specific to Galveston County enforcement practices.  In addition to disputing the merits of the case, both Andrade and Johnson contend that the Organizational Plaintiffs lack standing to sue them.

### B.    *The Organizational Plaintiffs*

The Organizational Plaintiffs are national nonpartisan organizations dedicated to helping citizens become registered to vote and to encouraging eligible voters to vote.  The Organizational Plaintiffs work to accomplish their mission through nonpartisan political advocacy, educational outreach,

and, most notably, voter registration drives.  The drives are primarily aimed at registering voters from demographic groups—particularly the African-American and Latino communities—with a history of underrepresentation in the political process.

While the Organizational Plaintiffs sometimes conduct drives by themselves, more often they provide funding, instruction, and training to "partner" organizations, typically local nonprofit or civic groups selected from the geographic area or demographic group targeted for a drive.  The same basic methods are followed in each drive.  The Organizational Plaintiffs will provide funding to a local partner organization.  Then, using that funding, the partner organization will hire temporary employees from the target community to serve as canvassers.  These canvassers are paid a flat or hourly wage to go to high traffic locations, such as grocery stores and public transit stations, and attempt to register other citizens to vote.  The canvassers encourage passersby to register, assist those who agree to register in filling out their applications, and collect the applications for delivery.  Once the applications are collected, the canvassers return them to their supervisors.  The supervisors then perform quality analysis and control checks by reviewing the applications for completeness and signs of fraud.  Afterwards, they photocopy or scan all nonconfidential parts of the

applications for tracking purposes and mail the applications to the appropriate state or county registrar.

After submitting the applications, the partner organizations coordinate with the Organizational Plaintiffs to inspect the relevant voter rolls and registration records. They do this by examining the rolls to determine whether the applicants were actually registered as new voters. Once this information is gathered, it is used in two ways. First, the applicants who were added to the rolls are contacted and encouraged to actually vote. Second, for those applicants who were not added to the rolls, the Organizational Plaintiffs and their partners seek to determine if the applications were rejected for a legitimate reason, such as a correct determination that an applicant was not eligible to register under state law or that an applicant provided incorrect information. Rejected applicants may be contacted to re-register if it is determined that they are eligible. If the Organizational Plaintiffs determine that the government has rejected an application for an improper reason, they may seek to remedy the situation through demand requests, public pressure, or legal action.

Although the Organizational Plaintiffs rarely canvass potential voters themselves, they have primary control over each registration drive. As the executive director of Project Vote testified, the Organizational Plaintiffs'

employees often train the managers and supervisors of their partner organizations by helping them assist applicants in the field, a process that requires the employees to directly handle voter registration applications. *See* Preliminary Inj. Hr'g Tr. 23–24, June 11, 2012, ECF No. 62. The Organizational Plaintiffs' employees identify areas to send canvassers, provide remedial training to canvassers who collect inadequate numbers of applications or who collect incomplete applications, review completed applications for signs of fraud, and handle phone calls from members of the public or local law enforcement. *See id.* at 23–26, 130–32. In addition, the Organizational Plaintiffs' employees make hiring and termination decisions. *See id.* at 144–45. The Organizational Plaintiffs condition their grants of funding on retaining control over all staffing decisions. *Id.*

### C. *The Texas Volunteer Deputy Registrar Regime*

#### 1. The Appointment Requirement

The Organizational Plaintiffs contend that the Texas Election Code's comprehensive regulation of third-party registration activities prevents them from conducting effective drives in the state. Most of the challenged statutes regulate the activities of VDRs, whom county registrars are required to appoint if certain qualifications are met. *See* Tex. Elec. Code Ann. §§

13.031(a), 13.032.  The provision governing the appointment of VDRs reads as follows:

### § 13.031(a).  Appointment; Term

(a)   To encourage voter registration, the registrar shall appoint as deputy registrars persons who volunteer to serve.

(b)   In this code, "volunteer deputy registrar" means a deputy registrar appointed under this section.

(c)   Volunteer deputy registrars serve for terms expiring December 31 of even-numbered years.

(d)   To be eligible for appointment as a volunteer deputy registrar, a person must:

   (1)   be 18 years of age or older;

   (2)   not have been finally convicted of a felony or, if so convicted, must have:

      (A)   fully discharged the person's sentence, including any term of incarceration, parole, or supervision, or completed a period of probation ordered by any court; or

      (B)   been pardoned or otherwise released from the resulting disability to vote; and

   (3)   meet the requirements to be a qualified voter under Section 11.002 except that the person is not required to be a registered voter.

   (3)   not have been finally convicted of an offense under Section 32.51, Penal Code.[2]

---

[2] The Texas Legislature amended § 13.031 twice during 2011.  Because each bill added a different subsection (d)(3) to the statute, the statute now contains two subsection (d)(3)s.

(e)     A volunteer deputy registrar appointed under this section may not receive another person's registration application until the deputy registrar has completed training developed under Section 13.047.  At the time of appointment, the voter registrar shall provide information about the times and places at which training is offered.

Tex. Elec. Code Ann. § 13.031.

The linchpin of the Texas regime, which the parties refer to as the "Appointment Requirement," is that only those who have been appointed VDRs may accept or deliver a third party's voter registration application. Given that most of the challenges in this case are premised on this understanding that a person who has not been appointed a VDR is prohibited from handling third-party applications, it is noteworthy that the Election Code does not contain such an express prohibition.  Instead, the Secretary interprets the prohibition to arise by implication.

The Secretary argues that this implied prohibition arises from the VDR appointment scheme itself.   What would be the purpose of the appointment process, as well as the numerous regulations that flow from the appointment scheme, if anybody could accept and deliver applications? Another argument derives from the text of the Election Code, which grants the power to handle applications to two specific types of third parties: VDRs

---

When this Court cites subsection (d)(3), it is referring to the subsection (d)(3) that requires VDRs to "meet the requirements to be a qualified voter under Section 11.002."

and "agents."  Although applicants must generally submit their applications to the appropriate county registrar "by personal delivery or by mail,"[3] they are also allowed to submit their applications to a VDR or agent for third-party delivery to the county registrar.  *Id.* §§ 13.002(a), 13.003(a), 13.038. In the Secretary's view, this is an exclusive grant of power.  Only an applicant's spouse, parent, or child may be their agent; thus, third parties who are not related to a particular applicant may only handle applications if appointed a VDR.  *Id.* § 13.003(b).  Moreover, it is a crime for a person to "purport to act" as a VDR if the person lacks an effective VDR appointment. *Id.* § 13.044.

There is one other wrinkle, however.  Although the Secretary reads section 13.038 as an exclusive grant of power to VDRs to handle completed applications, she nonetheless contends that any person may distribute blank applications to potential applicants.  *See* Def. Andrade's Mot. to Dismiss 29, ECF No. 13-2; Preliminary Inj. Hr'g Tr. 110–11, June 11, 2012; Pls.' Ex. 6, Texas Volunteer Deputy Registrar Guide.  As the Organizational Plaintiffs point out, this flies in the face of the plain text of section 13.038, which states that a VDR "may distribute voter registration application forms

---

[3] An explicit exception to the mode of delivery requirement is made for applicants participating in Texas's address confidentiality program.  Tex. Elec. Code Ann. § 13.002(a).

throughout the county and receive registration applications submitted to the deputy in person."  Tex. Elec. Code Ann. § 13.038; Preliminary Inj. Hr'g Tr. 428–29, June 12, 2012, ECF No. 63.   If the section is to be read as an exclusive grant of power to VDRs, consistency would seem to require reading it as an exclusive grant on both the distribution and collection elements.

No Texas court has interpreted these provisions.  Because this Court "lack[s] competence to rule definitively on the meaning of state legislation," *Arizonans for Official English v. Arizona*, 520 U.S. 43, 48 (1997), it must accept any "narrowing construction or practice to which the law is fairly susceptible."  *City of Lakewood v. Plain Dealer Publ'g Co.*, 486 U.S. 750, 770 n.11 (1988) (citations omitted); *cf. Ashwander v. Tenn. Valley Auth.*, 297 U.S. 288, 348 (1936) (Brandeis, J., concurring) (stating that when the constitutionality of a federal law is challenged, a court must "first ascertain whether a construction of the statute is fairly possible by which the question may be avoided") (citation omitted).[4]

---

[4] The Supreme Court has noted that "[w]arnings against premature adjudication of constitutional questions bear heightened attention when a federal court is asked to invalidate a State's law, for the federal tribunal risks friction generating error when it endeavors to construe a novel state Act not yet reviewed by the State's highest court."  *Arizona*, 520 U.S. at 79.   Were it possible, this Court would consider whether certification to the Texas Supreme Court would be an appropriate manner of resolving the proper interpretation of the Election Code provisions at issue.  However, because

The narrowing construction that has been offered is the Secretary's argument that section 13.038 exclusively grants VDRs the power to accept, handle, and deliver filled-out applications, but allows any person to distribute blank applications. Bearing in mind that Plaintiffs do not request preliminary relief from the Appointment Requirement itself,[5] this Court will assume at this stage of the litigation that the Election Code only forbids third parties from accepting, handling, or delivering a prospective voter's application without first being appointed VDRs.

### 2.    The VDR Scheme

Once individuals become VDRs, a comprehensive set of regulations governs their activity. Some of these regulations have been in place since 1987, but the 2011 letter that the Secretary sent the Organizational Plaintiffs clarified how stringently the state interprets these provisions. First, VDRs must carry signed certificates of appointment that contain their full names and residential addresses, and they must present these certificates as identification to any applicants who request to see them. Tex. Elec. Code Ann. § 13.033. Second, when VDRs accept applications, they must review them for completeness while the applicants are present and return them to

_____

Texas does not allow federal district courts to certify questions, that avenue is unavailable to this Court. *See* Tex. R. App. Proc. § 58.1.

[5] As discussed below, Plaintiffs do challenge the Appointment Requirement in their Complaint and seek a permanent injunction against it.

the applicants if they are unsigned or lack required information. *Id.* §
13.039.   If a county registrar determines that a VDR has "failed to
adequately review" an application for completeness, that county registrar
may terminate the VDR's appointment. *Id.* § 13.036(b).   Third, as made
clear by the 2011 letter the Secretary sent to the Organizational Plaintiffs,
VDRs may only accept applications from residents of the county in which
they were appointed.  *See id.* § 13.038; Pls.' Ex. 1, Letter from Ann
McGeehan to Niyati Shah 4 (May 13, 2011).    Fourth, VDRs must
personally deliver to the county registrar all applications submitted to them
within five days of receipt.  Tex. Elec. Code Ann. § 13.042(a)–(b).   VDRs
may not mail applications to the county registrar.  *Id.*; Pls.' Ex. 1, Letter
from Ann McGeehan to Niyati Shah 5.  Any VDR who fails to personally
deliver an application within five days is subject to a criminal penalty.  Tex.
Elec. Code Ann. § 13.043(a).  Fifth, VDRs may not photocopy applications
that they have collected, even if the copies redact all confidential
information.  *See id.* § 13.038; Pls.' Ex. 1, Letter from Ann McGeehan to
Niyati Shah 6.

Bills enacted during the 2011 legislative session imposed additional
requirements on VDRs.  Now, only Texas residents are allowed to be VDRs.
*See* Tex. Elec. Code Ann. §§  11.002(a)(5), 13.031(d)(3).   And, once

14

appointed, VDRs may not accept or deliver applications without first completing a training program approved by the Secretary and implemented by the county registrar who appointed them. *See id.* §§ 13.031(e), 13.047.

The new 2011 law additionally included another provision that affects VDRs but also applies more broadly to others involved in voter registration activities even if they are not accepting or delivering applications. That provision prohibits "compensat[ing] another person based on the number of voter registrations that the other person successfully facilitates"; "present[ing] another person with a quota of voter registrations to facilitate as a condition of payment or employment"; and "engag[ing] in another practice that causes another person's compensation from or employment status with the person to be dependent on the number of voter registrations that the other person facilitates." *Id.* § 13.008(a)(1)–(3). Accepting compensation for any of the above activities is also illegal. *Id.* § 13.008(a)(4). Any violation of the provision is a Class A misdemeanor. *Id.* § 13.008(b). Moreover, if the person who violates the provision is an entity, the entity's officers, directors, and agents can be punished for the offense. *Id.* § 13.008(c).

All told, the Texas regime is restrictive—and uniquely so. This is true in multiple ways. Only one other state of which either the parties or this

Court are aware—Wisconsin, which is a very different animal because it allows same-day registration and thus is exempt from the mandates of the NVRA[6]—requires individual canvassers to be appointed or registered with the government at the local level as Texas does.  *See* Pls.' Comparative Statement Regarding State Voter Registration Laws 2–3, ECF No. 58; Def. Andrade's Postsubmission Br. 6–8, ECF No. 60.  Most other states do not even have an appointment process at a statewide level.  A number of states allow but do not require canvassers to be appointed or registered as deputy registrars.  *See, e.g.*, Ariz. Rev. Stat. Ann. § 16-131 (allowing county recorders both to appoint deputy registrars and to distribute blank applications to "groups and individuals that request forms for conducting voter registration drives").  And a smattering of states require the person or entity overseeing a registration drive to register.  *See, e.g.*, Cal. Elec. Code § 2159.5 (requiring any person or entity that pays others to conduct third-party voter registration activities to maintain a list of all employees and to make that list available to the California Secretary of State on demand); Colo. Rev. Stat. Ann. § 1-2-701(1) (requiring voter registration drive organizers to file a statement of intent and designate the drive's agent); Del.

---

[6] *See* 42 U.S.C. § 1973gg-2(b)(2); Wis. Stat. § 6.15 (allowing same-day registration); Wis. Stat. § 6.26 (requiring canvassers to be appointed special registration deputies on a municipality-by-municipality basis).

16

Code Ann. tit. 15, § 2060 (requiring entities conducting organized voter registration drives to register with the state and provide the name and contact information of a responsible person).  One requires paid canvassers meeting a certain threshold of applications to register with the state.  *See* Mo. Rev. Stat. § 115.205 (requiring registration with the Missouri Secretary of State of any person paid for soliciting more than ten voter registration applications).

Moreover, canvasser appointment and registration requirements aside, many states do not place any restrictions on how registration drives may be run or how canvassers may work.  Some states' laws do contain prohibitions on voter registration activities that are similar to—albeit less expansive than—the prohibitions in the Texas Election Code.  *See, e.g.*, Colo. Rev. Stat. Ann. § 1-2-703(4) (banning the payment of compensation "based on the number of voter registration applications . . . distribute[d] or collect[ed]" but not restricting the use of voter registration quotas or other types of performance-based pay and employment actions); Del. Code Ann. tit. 15, § 2061 (requiring training for individuals participating in voter registration drives, but doing so on a statewide rather than county-by-county basis).  And other states' laws previously contained strict prohibitions that federal courts have since struck down.  *See, e.g.*, Fla. Stat. § 97.0575(3)(a) (2011), *invalidated by League of Women Voters of Fla. v. Browning*, 4:11cv628-

17

RH/WCS, 2012 WL 1957793 (N.D. Fla. May 31, 2012) (requiring voter registration organizations, on penalty of fine, to deliver all applications collected within 48 hours of the moment of receipt); Ohio Rev. Code Ann. §§ 3503.19, 3599.11 (2006), *invalidated by Project Vote v. Blackwell*, 455 F. Supp. 2d 694 (N.D. Ohio 2006) (requiring any person who registered another person to vote to deliver that person's application directly to the appropriate state office, without the application going through the hands of any intermediaries).

Yet, especially when viewed against the background of unrestricted third-party voter registration activity that prevails in most states, the Texas Election Code's requirements stand out.  While other states may restrict an activity here or prescribe a regulation there, no other state of which this Court is aware has gone as far as Texas in creating a regulatory web that controls so many aspects of third-party voter registration activity.

### D.    *The Plaintiffs' Motion for a Preliminary Injunction*

Plaintiffs allege that these pervasive requirements, alone and in combination, render their voter registration practices illegal.  Claiming that the provisions are preempted by federal law, run afoul of the First or

Fourteenth Amendments, or both, Plaintiffs seek preliminary relief from the

following parts of the Election Code:[7]

- *The Photocopying Prohibition.* Section 13.038, as interpreted by the Secretary, prohibits VDRs from photocopying applications they receive and submit, even for tracking purposes.

- *The Personal Delivery Requirement.* Section 13.042 requires that VDRs deliver applications to the appropriate county registrars in person. It forbids VDRs from mailing these applications.

- *The In-State Restriction.* Sections 13.031(d)(3) and 11.002(a)(5) together have the effect of prohibiting non-Texas residents from serving as VDRs.

- *The County Limitation.* Defendants interpret Section 13.038 to prohibit VDRs from accepting applications from residents of counties other than the county in which the VDRs are appointed.

- *The Compensation Prohibition.* Section 13.008 criminalizes a number of compensation practices, including "compensat[ing] another person based on the number of voter registrations that the other person successfully facilitates," "present[ing] another person with a quota of voter registrations to facilitate as a condition of payment or employment," and "engag[ing] in another practice that causes another person's compensation from or employment status with the person to be dependent on the number of voter registrations that the other person facilitates."

- *The Completeness Requirement.* Section 13.039(a) requires VDRs to examine applications for completeness in the presence of the applicant, and section 13.036(b) allows for the termination of the appointment of any VDR who fails to "adequately review" an

---

[7] Plaintiffs do not ask for preliminary relief on the validity of the "Law Enforcement Exception" or the "Appointment Requirement" identified in their complaint, and they do not ask for preliminary relief on the validity of Galveston County's alleged unlawful enforcement of a photo ID requirement or its alleged failure to follow Texas law requiring notice to voters placed on a suspension list.

19

application.  Moreover, section 13.039(b) requires VDRs to return incomplete applications to applicants for completion.

- *The Training Requirement.*  Section 13.031(e) requires VDRs to undergo training approved by the state and administered by the county registrars pursuant to section 13.047.

- *The Identification Requirement.*  Section 13.033 requires VDRs to carry with them a certificate of appointment that contains their full name and residential address, and to produce the certificate for inspection to any applicant who requests to view it.

## E.    The Evidentiary Hearing

On May 24, 2012, before evidence was taken or argument heard on Plaintiffs' motion, this case was reassigned to this Court.  The Court discussed outstanding motions with counsel in a telephone conference on June 5, 2012.  The next week, during a day-and-a-half hearing, the Court took extensive evidence and heard argument on the preliminary injunction claims as well as on Defendants' separate motions to dismiss for lack of standing.

Plaintiffs presented the testimony of five witnesses: Mr. Michael Slater, the executive director of Project Vote; Dr. Denise Rousseau, an expert in behavioral and organizational psychology from Carnegie Mellon University; Ms. Esthelle Holmes and Ms. May Mitchell, two VDRs from Galveston County; and former Governor Mark White, who signed the Election Code into law in 1985 and who, during his tenure in the 1970s as

20

Secretary of State, was responsible for enforcing Texas's election laws. Plaintiffs also presented thirty-two exhibits and the declarations of two other witnesses. The Secretary presented no witnesses or exhibits. Johnson presented the testimony of herself and Dominique Allen, the senior Voter Registration Specialist in the Galveston County Registrar's office. Johnson also introduced two exhibits.

## II.   STANDING

Defendants filed motions to dismiss under Rule 12(b)(1), arguing as a matter of standing law that they are not proper parties to this suit. These motions challenge this Court's jurisdiction and therefore must be addressed before considering the Organizational Plaintiffs' motion for a preliminary injunction. This Court finds that, with respect to the eight claims on which they have requested preliminary relief, the Organizational Plaintiffs have standing to sue both Defendants. Defendants' motions to dismiss under Rule 12(b)(1) are therefore denied with respect to those claims.[8]

Plaintiffs must show that they satisfy the trifecta of standing: injury in fact, causation, and redressability. *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992); *Allen v. Wright*, 468 U.S. 737, 751 (1984). As to

---

[8] Defendants' 12(b)(1) motions against Plaintiffs' other claims will be addressed in a later order at the appropriate stage of the litigation along with their remaining 12(b)(6) motions to dismiss for failure to state a claim. *See infra* note 13.

the first requirement, that of injury in fact, the Organizational Plaintiffs allege that the Election Code makes it impossible for them to conduct voter registration drives and achieve their desired level of voter registration activity because it dramatically increases the administrative costs of conducting registration drives and bans them from using many common compensation and employment practices with their paid canvassers. Pls.' First Am. Compl. ¶¶ 58, 59, ECF No. 8. The Organizational Plaintiffs also allege that Defendants' refusal to disclose voter registration records and the ban on photocopying voter registration applications "frustrates and hampers" their ability to register voters. *Id.* at ¶ 68. Defendants do not seriously dispute that the Organizational Plaintiffs have established the existence of a judicially cognizable injury in fact. *See* Def. Andrade's Mot. to Dismiss 9; Def. Johnson's Am. Mot. to Dismiss 9, ECF No. 22. This Court agrees that, with respect to each claim on which they request preliminary relief, the Organizational Plaintiffs have fulfilled their duty on this first prong of the standing analysis.[9]

---

[9] Other courts have held that injuries similar to those alleged by Plaintiffs satisfy the requirement of injury in fact. *See, e.g.*, *Fla. State Conference of the N.A.A.C.P. v. Browning*, 522 F.3d 1153, 1165–66 (11th Cir. 2008) (holding that an organization that wished to conduct voter registration drives had alleged a sufficient injury in fact by stating that the challenged statute would require it to divert time and personnel from registering voters to complying with the statute); *Charles H. Wesley Educ. Found., Inc. v. Cox*, 408 F.3d 1349, 1353–54 (11th Cir. 2005) (holding that "it is clear that [an organization's] right to conduct voter registration drives is a legally protected interest);

Defendants do, however, strongly dispute that Plaintiffs have met the causation and redressability requirements.  Under *Lujan*, causation is present only if the Plaintiffs can show that their injuries are "fairly traceable" to Defendants and not "the result of the independent action of some third party."  *Lujan*, 504 U.S. at 560 (citation and internal punctuation omitted). Redressability is only satisfied if it is "likely" that Plaintiffs' injuries will be "redressed by a favorable decision" against Defendants.  *Id.* at 561 (citation omitted).

Unlike the common standing challenge in which a defendant argues that litigation cannot vindicate the plaintiff's interests as a general matter, *see, e.g.*, *Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26, 40–46 (1976), neither Defendant claims that the federal courts are unable to provide adequate relief in this type of case.  Instead, each claims that she is not the proper party and instead points the finger at the other: the Secretary argues that Plaintiffs only have standing to sue Johnson and other county registrars, while Johnson argues that Plaintiffs only have standing to sue the Secretary. *See, e.g.*, Def. Johnson's Am. Mot. to Dismiss 11; Preliminary Inj. Hr'g Tr.

---

*Project Vote/Voting for Am., Inc. v. Long*, 752 F. Supp. 2d 697, 703–04 (E.D. Va. 2010) (holding that organizations engaged in voter registration activity had a right under the NVRA to obtain voter registration records).

390, June 12, 2012.   The Court therefore analyzes Plaintiffs' standing against each Defendant in turn.

### A.   Secretary of State Andrade

The Secretary argues that she is not the cause of Plaintiffs' alleged injuries because the Election Code delegates enforcement power to county registrars like Johnson.  *See* Def. Andrade's Mot. to Dismiss 9–13.  She also argues that enjoining her would not redress Plaintiffs' injuries because she has no direct authority to control the actions of the county registrars.  *See id.* Although the Secretary acknowledges that she is the official who interprets the Election Code and provides guidance on enforcement to the registrars of all 254 Texas counties, she contends that her authority is only persuasive, and that she is powerless to stop county registrars from disobeying her. Preliminary Inj. Hr'g Tr. 390–92, June 12, 2012.  The Secretary thus argues that only Johnson—and the 253 other Texas county registrars, who were not named as parties—are proper defendants in this type of suit.  *Id.* at 390.

The Secretary's argument is at odds with numerous cases in which plaintiffs have sued secretaries of state when challenging voter registration laws even though states commonly delegate voter registration

responsibilities to county officials.[10]   In most of these cases, the secretaries did not even raise the argument that only county officials could be sued.  In the two courts of appeals cases in which secretaries of state did raise the argument, the courts rejected it.  *See Harkless*, 545 F.3d at 451–55 (finding standing to sue the Ohio Secretary of State); *see also United States v. Missouri*, 535 F.3d 844, 846 n.1 (8th Cir. 2008) (finding that the Missouri Secretary of State was the proper party to be sued under the NVRA even though enforcement power was delegated to local officials).  The Sixth and Eighth Circuits relied primarily on Ohio's and Missouri's designations of their secretaries of state as the officials charged with administering the NVRA even though state law delegated enforcement powers to local county authorities.  *See Harkless*, 545 F.3d at 452 (citing 42 U.S.C. § 1973gg-8); *Missouri*, 535 F.3d at 846 n.1 (same).  Texas has likewise designated the Secretary as the state official responsible for administering the NVRA.  Tex. Elec. Code Ann. § 31.001(a).

---

[10] *See, e.g.*, *Harkless v. Brunner*, 545 F.3d 445 (6th Cir. 2008); *Fla. State Conference of the N.A.A.C.P.*, 522 F.3d 1153; *Charles H. Wesley Educ. Found., Inc.*, 408 F.3d 1349; Order Granting a Preliminary Inj., *League of Women Voters of Fla. v. Browning*, 4:11cv628-RH/WCS, 2012 WL 1957793 (N.D. Fla. May 31, 2012); *Project Vote/Voting for Am., Inc.*, 752 F. Supp. 2d 697; *Am. Ass'n of People with Disabilities v. Herrera*, 690 F. Supp. 2d 1183 (D.N.M. 2010); *Blackwell*, 455 F. Supp. 2d 694.  The only case this Court is aware of in which every local county registrar was named as a party is *Gonzalez v. Arizona*, 677 F.3d 383 (9th Cir. 2012) (en banc), in which the State of Arizona itself was also named as a defendant.

The *Harkless* Court's analysis of the standing issue is compelling with respect to the claimed violations of the NVRA, but this case also involves constitutional challenges divorced from the Secretary's status as the NVRA designee.  Recent Fifth Circuit cases on causation and redressability provide the standards for analyzing that issue.  The first is *Okpalobi v. Foster*, 244 F.3d 405 (5th Cir. 2001) (en banc), in which a group of doctors filed suit against the Louisiana Governor and Attorney General to challenge Louisiana's creation of a private cause of action against persons who perform abortions.  *Id.* at 409.  The Secretary relies heavily on *Okpalobi*, which found no standing because the Louisiana Governor and Attorney General had absolutely no power to prevent a private plaintiff from filing suit under the Louisiana statute.  *Id.* at 426–27 (opinion of Jolly, J.); *id.* at 429 (Higginbotham, J., concurring); *id.* at 432–33 (Benavides, J., concurring).

But a subsequent Fifth Circuit decision involving the same Louisiana statute provides a closer analogy to this case.  *See K.P. v. LeBlanc*, 627 F.3d 115 (5th Cir. 2010).  In *LeBlanc*, a former patient filed an administrative claim for damages with the Louisiana Patients' Compensation Fund Oversight Board against the physicians who had performed her abortion.  *Id.* at 119–20.   Under Louisiana law, physicians could enroll in the

26

Compensation Fund in order to have their medical malpractice liability capped. *Id.* at 119. Patients seeking malpractice damages could file administrative claims with the Board, which had the power to either refuse the claims or convene a medical review panel to consider their merit. *Id.* In *LeBlanc*, the Board refused the patient's claim on the ground that the Louisiana statute barred doctors from capping their liability for claims arising from abortion procedures. *Id.* at 120. The former patient then sued the doctors asserting the cause of action created by the statute challenged in *Okpalobi*. *Id.* The doctors responded by suing the Board to enjoin the statute on its face and as it had been applied to forbid them from participating in the Compensation Fund. *Id.* The district court dismissed the suit for lack of standing, citing *Okpalobi* for the proposition that the Board lacked enforcement power with respect to the private cause of action. *Id.*

The Fifth Circuit reversed. *Id.* at 119. In doing so, it recognized that the Board had no power to enforce the Louisiana statute creating the private cause of action. *Id.* at 123. However, it distinguished *Okpalobi* by noting that, unlike the Louisiana Governor or Attorney General, the Board could take *some* action that affected the statute's application. *See id.* at 123–24. The Board, the Fifth Circuit noted, could still refuse administrative claims for payment or convene medical review panels to consider claims, even

27

though it could not stop patients from bringing tort actions in state court.  *Id.*
The Fifth Circuit "acknowledge[d] that the Board is far from the sole
participant in the application of the challenged statute" but nonetheless held
that the statute "impact[ed] the Board's actions sufficiently to confer
standing on the[] Plaintiffs."  *Id.* at 123.  The Fifth Circuit noted that a
"plaintiff satisfies the redressability requirement when he shows that a
favorable decision will relieve a discrete injury to himself.  He need not
show that a favorable decision will relieve his *every* injury." *Id.* (emphasis in
original) (quoting *Larson v. Valente*, 456 U.S. 228, 243 n.15 (1982)).
Because the Board could "unilaterally preclude the Plaintiffs from claiming
the benefits of limited liability" and "ha[d] definite responsibilities relating
to the application of [the Louisiana statute]," the physicians had standing to
sue. *Id.* at 123–24.

Another post-*Okpalobi* case's summary of redressability law indicates
an even lower threshold.  *See Allstate Ins. Co. v. Abbott*, 495 F.3d 151 (5th
Cir. 2007).  In *Abbott*, the Fifth Circuit endorsed Justice O'Connor's opinion
in *Franklin v. Massachusetts*, 505 U.S. 788 (1992), as establishing the rule
that redressability is satisfied when nonparty actors can be expected to
amend their conduct in response to a court declaration against a party.
*Abbott*, 495 F.3d at 159–60 n.19.  The plaintiffs in *Franklin* had challenged

the system by which the federal government allocated, for voter registration purposes, the home states of federal employees serving overseas. *Franklin*, 505 U.S. at 790–91.  They filed suit against the President, the Secretary of Commerce, the Clerk of the U.S. House of Representatives, and Census Bureau officials. *Id.* at 790.  Justice O'Connor's plurality opinion held that the plaintiffs' alleged injuries would be redressable solely by a declaration against the Secretary of Commerce even though the Secretary of Commerce could not directly enforce a court order and had no authority to order the other officials to enforce the law. *Id.* at 803.  In so holding, Justice O'Connor stated:

> The Secretary certainly has an interest in defending her policy determinations . . . ; even though she cannot herself [enforce the law by] chang[ing] the reapportionment, she has an interest in litigating its accuracy. . . . [W]e may assume it is substantially likely that the President and other executive and congressional officials would abide by an authoritative interpretation of the . . . statute and constitutional provision by the District Court, even though they would not be directly bound by such a determination.

*Id.*

Thus, under *Okpalobi*, causation and redressability will not exist if a governmental defendant has no "duty or ability to do *anything*" about the enforcement of the challenged law. *Okpalobi*, 244 F.3d at 427 (emphasis in original).  But *LeBlanc* makes clear that causation and redressability will

exist when a defendant has "definite responsibilities relating to the application of" the challenged law. *LeBlanc*, 627 F.3d at 124; *see also* 13A CHARLES ALAN WRIGHT ET AL., FEDERAL PRACTICE AND PROCEDURE § 3531.6 (3d ed. 2008) ("The Court has said that standing does not require a plaintiff to show that a decree can remedy his every injury. Some measure of relief suffices."). And *Abbott*, applying *Franklin*, clarifies that redressability will exist if a declaration against a governmental defendant without enforcement power is reasonably likely to cause nonparties with enforcement power to obey the court's order. *Abbott*, 495 F.3d at 159–60 & n.19; *see also Bennett v. Spear*, 520 U.S. 154, 169–71 (1997) (finding that redressability was satisfied where the plaintiffs sought to have a Fish and Wildlife Service advisory opinion set aside because such advisory opinions were often followed by the agencies that directly caused plaintiffs' injuries).

With these rules in hand, the standing analysis requires the Court to determine what powers of enforcement the Secretary possesses. The Secretary's powers under Texas law are certainly not exhaustive, but they are nonetheless expansive—indeed, they are far more expansive than those of the Board in *LeBlanc* or the Commerce Secretary in *Franklin*. The Secretary is given the authority and mandate to "obtain and maintain uniformity in the application, operation, and interpretation" of election laws

30

in Texas, and pursuant to that authority she promulgates binding regulations and nonbinding election law opinions.[11]   Tex. Elec. Code Ann. § 31.003. She must "assist and advise all election authorities with regard to the application, operation, and interpretation" of the election laws, and "may take appropriate action to protect the voting rights of the citizens of [Texas] from abuse by the authorities administering the state's electoral processes." *Id.* §§ 31.004(a), 31.005(a).   Where she "determines that a person performing official functions in the administration of any part of the electoral processes is exercising the powers vested in that person in a manner that impedes the free exercise of a citizen's voting rights," she "may order the person to correct the offending conduct."  *Id.* § 31.005(b).  And although she may not be able to directly order a county voting registrar to follow state law in other instances, the Secretary admitted in this Court that—through the Texas Attorney General—she can still bring a suit in her name to obtain a writ of mandamus against any county official who refuses to follow her interpretations of the voting laws.  Preliminary Inj. Hr'g Tr. 395–96, June 12, 2012; *see also* Def. Andrade's Mot. to Dismiss 10. Finally, the Secretary can withhold certain state funds from county registrars

---

[11] Indeed, the Secretary responded promptly to the Organizational Plaintiffs' letter asking for clarification on the proper interpretation of the Election Code.  Pls.' Ex. 1, Letter from Ann McGeehan to Niyati Shah.

who refuse to follow the regulations that she has promulgated in the Texas Administrative Code, one of which requires VDRs to personally deliver certain voter registration applications in compliance with the deadlines in section 13.042 of the Election Code.  *See* 1 Tex. Admin. Code § 81.4 (2002).[12]   The Secretary's authority more than satisfies *LeBlanc*'s requirement that she have "definite responsibilities relating to the application of" the Election Code.  *LeBlanc*, 627 F.3d at 124.  She is therefore a proper party to this suit.

Even if the Secretary's powers were limited to interpretation, *Franklin*—viewed in light of the Secretary's admissions and the evidence presented to this Court—would also require this conclusion.  If the Secretary were to be enjoined, most—if not all—Texas county registrars are likely to amend their conduct in response to the injunction.  Defendant Johnson testified that the Secretary was "absolutely essential" to the operation of

---

[12] The Secretary and Johnson disagree about whether the Secretary can withhold these "Chapter 19 funds" as an enforcement mechanism.  Johnson claims that the funds can be withheld whenever a county registrar refuses to follow Texas law, while the Secretary claims they can never be withheld.  *See* Def. Andrade's Postsubmission Br. 2, ECF No. 60; Preliminary Inj. Hr'g Tr. 403–05, June 12, 2012.  There are no Texas cases on point to guide this court, but it is apparent that there are relevant situations in which the Secretary could withhold Chapter 19 funding as an enforcement mechanism.  Under Texas law, county registrars are granted certain state funds to defray the costs of voter registration.  *See* Tex. Elec. Code Ann. §§ 19.001–19.006.  However, the Secretary may withhold funds from a county registrar not in substantial compliance with "rules implementing the registration service program," *id.* § 19.002(d), and may refuse to grant funds to county registrars who fail to adhere to the rules the Secretary promulgates in chapter 81 of the Texas Administrative Code.  1 Tex. Admin. Code § 81.29 (2007).

voter registration procedures in her office, and that she had no choice but to obey the Secretary's "restrictions."  Preliminary Inj. Hr'g Tr. 352, June 12, 2012.  Governor White testified that, during his tenure as Secretary of State in the 1970s, he was able to use the persuasive power of his office to convince several recalcitrant county registrars to follow the law.  *Id.* at 304–07.  And during the hearing, the Secretary admitted that at least some county registrars follow the progress of lawsuits against the Secretary and seek updates from her about how the rulings in those suits affect their conduct.  *Id.* at 399–400.  *Lujan*'s requirements that the Organizational Plaintiffs' alleged injuries be "fairly traceable" to the Secretary and "likely" to be redressed by an injunction against her are satisfied.  *Lujan*, 504 U.S. at 560.  The Organizational Plaintiffs have standing in their suit against the Secretary.

### B.  County Registrar Johnson

The analysis of the Organizational Plaintiffs' standing to sue Johnson is straightforward.  Johnson argues that she is not the cause of Plaintiffs' injuries because she is required to enforce the laws enacted by the Texas Legislature and the interpretations and regulations promulgated by the Secretary, whatever those may be.  *See* Def. Johnson's Am. Mot. to Dismiss 11–12; Preliminary Inj. Hr'g Tr. 352, June 12, 2012.  Johnson further argues

that Plaintiffs' injuries will not be redressed by enjoining her because an injunction would not affect the Election Code's statewide enforcement. Thus, Johnson's view, which she has repeated throughout this litigation, is that her role is ministerial and that she is an unwitting and powerless spectator to the Organizational Plaintiffs' real dispute against the state. *See* Def. Johnson's Am. Mot. to Dismiss 11; Preliminary Inj. Hr'g Tr. 458–59, June 12, 2012.

While it is true that Johnson had nothing to do with enacting the Election Code, is not involved in the promulgation of statewide regulations interpreting it, and cannot enforce it outside Galveston County, Texas law designates her as the governmental official who is directly responsible for Galveston County's enforcement of many of the provisions challenged in this suit. As quick reference to well-known Supreme Court cases illustrates, constitutional challenges are often brought against local entities or officials enforcing statewide laws they played no role in creating. *See, e.g.*, *Roe v. Wade*, 410 U.S. 113 (1973) (challenging a state law criminalizing abortion by bringing suit against the district attorney of Dallas County, Texas); *Sch. Dist. of Abington Twp., Pa. v. Schempp*, 374 U.S. 203 (1963) (challenging a state law requiring the reading of Bible verses in public schools by bringing suit against the school district of Abington Township, Pennsylvania).

Texas law designates county tax assessors like Johnson as the voter registrars for their counties.  Tex. Elec. Code Ann. § 12.001.  As the voter registrar, she is directly responsible for the appointment and training of VDRs and the enforcement of all the VDR regulations.  *See* Tex. Elec. Code Ann. §§ 13.031, 13.036, 13.047.  And county tax assessors like Johnson are also directly involved in the decision of whether to release county voter registration records pursuant to demands made under the NVRA.  *See* Pls.' Ex. 3, Letter from Vince Ryan, Harris Cnty. Att'y, to the Hon. Greg Abbott (Dec. 7, 2010).  Because Johnson enforces the laws that the Organizational Plaintiffs contend cause them injury, an injunction against her would directly redress that alleged injury.  *See City of Herriman v. Bell*, 590 F.3d 1176, 1182 (10th Cir. 2010) (holding, in response to a nearly identical standing argument from a local elections clerk with similarly ministerial duties, that standing was satisfied because the defendant was "the official responsible for running the local . . . election, and may yet be subject to future federal court restrictions").

Both the Secretary and Johnson have a designated role to play in the interpretation and enforcement of the Election Code, and both are proper parties to any suit seeking to challenge its validity and enjoin its

enforcement.  Plaintiffs have amply demonstrated their standing to sue both Defendants.  Defendants' motions to dismiss for lack of standing are denied.

### III.   PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION

With the jurisdictional question settled, the Court now turns to Plaintiffs' motion for a preliminary injunction.  To prevail at this early stage of the litigation, Plaintiffs must show "(1) a substantial likelihood of success on the merits, (2) a substantial threat of irreparable injury if the injunction is not issued, (3) that the threatened injury if the injunction is denied outweighs any harm that will result if the injunction is granted, and (4) that the grant of an injunction will not disserve the public interest."  *Janvey v. Alguire*, 647 F.3d 585, 595 (5th Cir. 2011) (citation omitted).[13]

#### A.   *First Factor—Substantial Likelihood of Success*

##### 1.  Preemption Challenges

###### a.  Preemption Under the Elections Clause

Of the eight regulations at issue in the preliminary injunction stage, Plaintiffs argue that the federal NVRA preempts the following five: (i) the Photocopying Prohibition; (ii) the Personal Delivery Requirement; (iii) the

---

[13] Defendants' motions to dismiss for failure to state a claim pursuant to Rule 12(b)(6) are partially addressed herein.  For the challenges discussed below on which the Court concludes that Plaintiffs are substantially likely to succeed, that analysis necessarily denies the 12(b)(6) motions.  For the claims that the Court found did not meet the "substantial likelihood" standard, or those that the Organizational Plaintiffs did not include in their request for preliminary relief, the Court will address the 12(b)(6) motions in a future order.

County Limitation; (iv) the Training Requirement; and (v) the Completeness Requirement.  This Court finds that Plaintiffs have demonstrated that they are substantially likely to succeed in their preemption challenges to the Photocopying Prohibition and the Personal Delivery Requirement.

Preemption challenges usually derive from the Supremacy Clause. But when preemption challenges are brought against state election laws, the Elections Clause of the Constitution governs.  *See Foster v. Love*, 522 U.S. 67, 69 (1997); *see also, e.g.*, *Gonzalez v. Arizona*, 677 F.3d 383, 390–92 (9th Cir. 2012) (en banc); *Harkless*, 545 F.3d at 454; *Ass'n of Cmty. Orgs. for Reform Now (ACORN) v. Edgar*, 56 F.3d 791, 793–94 (7th Cir. 1995).  The Elections Clause states that "[t]he Times, Places and Manner of holding Elections for Senators and Representatives, shall be prescribed in each State by the Legislature thereof; but the Congress may at any time by Law make or alter such Regulations, except as to the Places of chusing Senators."  U.S. Const. art. I, § 4, cl. 1.  It "invests the States with responsibility for the mechanics of congressional elections . . . but only so far as Congress declines to preempt state legislative choices."  *Foster*, 522 U.S. at 69.  When Congress acts to regulate federal elections, its "regulations . . . are paramount to those made by the State legislature[s]; and if they conflict

therewith, the latter, so far as the conflict extends, ceases to be operative." *Ex parte Siebold*, 100 U.S. 371, 384 (1879).

Although it is clear that the Elections Clause grants Congress the power to override state election laws regulating federal elections, case law says little about the proper standard to apply when analyzing Elections Clause preemption. The Fifth Circuit's guidance on this matter is limited to a brief statement that state and federal law must "directly conflict" in order for Elections Clause preemption to occur. *Voting Integrity Project, Inc. v. Bomer*, 199 F.3d 773, 775 (5th Cir. 2000).[14] Neither the Supreme Court nor the Fifth Circuit have ruled whether Elections Clause preemption law contains the Supremacy Clause's "presumption against preemption," *see Medtronic, Inc. v. Lohr*, 518 U.S. 470, 485 (1996), its "plain statement" rule, *see Gregory v. Ashcroft*, 501 U.S. 452, 461 (1991), or its requirement that a reviewing court attempt to reconcile conflicting federal and state law before preempting, *see Altria Grp., Inc. v. Good*, 555 U.S. 70, 76–77 (2008). However, the Sixth and Ninth Circuits have spoken convincingly on these matters.

---

[14]  This requirement does not limit this Court's scrutiny of the challenged regulations. In *Bomer*, the Fifth Circuit endorsed a far-ranging Elections Clause analysis. The *Bomer* court went beyond the plain text of the federal law at issue to examine a wide variety of sources—including a law review article and the Congressional Record—in determining that no conflict existed in that case. *See Bomer*, 199 F.3d at 776–77.

In the recently decided *Gonzalez v. Arizona*, 677 F.3d 383 (9th Cir. 2012) (en banc), the en banc Ninth Circuit discussed the standard for Election Clause preemption in the context of a challenge to Arizona's Proposition 200. That proposition required voter registration applicants to present proof of U.S. citizenship when registering to vote. *Id.* at 387. The plaintiffs in that suit claimed that the proof-of-citizenship requirement conflicted with the NVRA's requirement that states accept applications submitted using the "federal form," the content of which the NVRA prescribes and limits. *Id.* at 390; *see* 42 U.S.C. §§ 1973gg-2(a)(2), 1973gg-4, 1973gg-7. The Ninth Circuit agreed and held that Proposition 200's proof-of-citizenship requirement was preempted as applied to the federal form. *Gonzalez*, 677 F.3d at 403.

Judge Ikuta's opinion rejected Arizona's argument that the Supremacy Clause's presumption against preemption and plain statement rule should apply.[15] It noted that, when analyzing preemption under the Supremacy Clause, courts must act with great hesitation before preempting in order to preserve the "delicate balance" between the states and the federal

---

[15] Eight of the ten judges in *Gonzalez* agreed on this point. Six joined Judge Ikuta's majority opinion in full on this issue, while Chief Judge Kozinski, writing separately to concur, agreed that the presumption against preemption and plain statement rule could not be applied because "the Supreme Court has never articulated any doctrine giving deference to the states under the Elections Clause." *Gonzalez v. Arizona*, 677 F.3d 383, 400 (9th Cir. 2012) (en banc) (Kozinski, C.J., concurring).

government.  *See id.* at 392 (quoting *Gregory*, 501 U.S. at 460).  This, it said, was because the Supremacy Clause addressed preemption "in areas within the states' historic police powers."  *See id.*; *see also Gregory*, 501 U.S. at 461 ("[The Supremacy Clause's] plain statement rule is nothing more than an acknowledgement that the States retain substantial sovereign powers under our constitutional scheme, powers with which Congress does not readily interfere.").  Judge Ikuta contrasted the domain of the Supremacy Clause with that of the Elections Clause, which expressly "committed" federal election procedures "to the exclusive control of Congress." *Gonzalez*, 677 F.3d at 391 (quoting *Colegrove v. Green*, 328 U.S. 549, 554 (1946)).  Because the Elections Clause governs "only an area in which the states have no inherent or reserved power: the regulation of federal elections," the presumption against preemption and plain statement rule did not apply.  *Id.* at 392 (citing *U.S. Term Limits, Inc. v. Thornton*, 514 U.S. 779, 804–05 (1995)); *accord Harkless*, 545 F.3d at 454 (holding that the presumption against preemption and the plain statement rule are inapplicable in the Elections Clause analysis).

Thus, the Elections Clause requires a more searching preemption analysis than that allowed under the Supremacy Clause.  The Court notes, however, that the full extent of the distinction between Elections Clause

preemption and Supremacy Clause preemption need not be resolved at this time.  The challenged provisions "directly conflict" with the mandates of the NVRA; for now, that is all that is required to determine that Plaintiffs are substantially likely to succeed on the merits of the two claims which the Court now addresses.  *Bomer*, 199 F.3d at 775.

### b.  The Photocopying Prohibition

The Texas Election Code states that "[a] volunteer deputy registrar may distribute voter registration application forms throughout the county and receive registration applications submitted to the deputy in person." Tex. Elec. Code Ann. § 13.038.  The Secretary contends that section 13.038 is an exclusive grant of power to VDRs, and that, because VDRs are limited to distributing and collecting applications for delivery, they may not make copies of the applications they collect, particularly given the confidentiality requirements of section 13.004.  *See* Tex. Elec. Code Ann. §§ 13.004, 13.038; Pls.' Ex. 1, Letter from Ann McGeehan to Niyati Shah 6.  The Organizational Plaintiffs contend that the following NVRA provision, titled "Public disclosure of voter registration activities," preempts the prohibition on photocopying:

> Each State shall maintain for at least 2 years and shall make available for public inspection and, where available, photocopying at a reasonable cost, all records concerning the implementation of programs and activities conducted for the

purpose of ensuring the accuracy and currency of official lists
of eligible voters, except to the extent that such records relate to
a declination to register to vote or to the identity of a voter
registration agency through which any particular voter is
registered.

42 U.S.C. § 1973gg-6(i).

The Secretary defends the Photocopying Prohibition on the grounds
that (1) voter registration applications are not "records concerning the
implementation of programs and activities conducted for the purpose of
ensuring the accuracy and currency of official lists of eligible voters" subject
to public disclosure under the NVRA; and (2) even if voter registration
applications are subject to public disclosure, privacy interests counsel
against letting Plaintiffs photocopy the applications.  *See* Def. Andrade's
Mot. to Dismiss 14–20; Pls.' Ex. 1, Letter from Ann McGeehan to Niyati
Shah 6.

A recent appellate decision demonstrates that the Organizational
Plaintiffs have a substantial likelihood of prevailing on this challenge.  Three
days after the conclusion of the preliminary injunction hearing, the Fourth
Circuit found in favor of the same Organizational Plaintiffs in a similar
challenge.  *See Project Vote/Voting for Am., Inc. v. Long*, 682 F.3d 331 (4th
Cir. 2012).  In *Long*, the Organizational Plaintiffs challenged the Virginia
State Board of Elections's contention that rejected voter registration

applications in the custody of a local registrar did not need to be released under the NVRA's public disclosure provision.  *See id.* at 333–34.  The Board made arguments that were essentially identical to the Secretary's two defenses.  *See id.* at 335–40.

The *Long* court held that completed voter registration applications are records within the meaning of the NVRA's public disclosure provision, and that these records could not be withheld in order to protect voter privacy.  *Id.* at 340.  Judge Wilkinson's opinion first noted the purposes of the NVRA: to "increase the number of eligible citizens who register to vote"; to "enhance[] the participation of eligible citizens as voters"; to "protect the integrity of the electoral process"; and to "ensure that accurate and current voter registration rolls are maintained."  *Id.* at 334 (quoting 42 U.S.C. § 1973gg(b)).  In support of these goals, the *Long* court recognized that the NVRA's public disclosure requirement "embodies Congress's conviction that Americans who are eligible under law to vote have every right to exercise their franchise, a right that must not be sacrificed to administrative chicanery, oversights, or inefficiencies."  *Id.* at 334–35.

Turning to the statute itself, the *Long* court conducted a thorough textual analysis and concluded that the NVRA's public disclosure requirement "unmistakably encompasses completed voter registration

applications."  *Id.* at 335–36.  Then, the court rejected the Board's privacy arguments, noting that the Organizational Plaintiffs had only requested nonconfidential information (i.e., copies of applications with Social Security numbers redacted).  *Id.* at 338–40.  In doing so, the court stated that "[i]t is not the province of this court . . . to strike the proper balance between transparency and voter privacy. . . .  Congress has already answered the question by enacting [section 1973gg-6(i)], which plainly requires disclosure of completed voter registration applications."[16]  *Id.* at 339.

This Court agrees with the statutory analysis in Judge Wilkinson's opinion and adopts it in full.  But *Long* dealt with voter registration applications already in the custody of the appropriate registrar.  In this case, the Organizational Plaintiffs do ask for access to such records in their complaint, though they have not asked for preliminary relief on that issue.  But their instant challenge, on which they have requested preliminary relief, is to the prohibition on copying applications that have not yet been submitted to governmental custody.  Is the outcome any different for applications that are in the custody of a VDR but have not yet been submitted to the county registrar?

---

[16] It is worth noting that the Organizational Plaintiffs have not requested any information that is not already available to political campaigns or anyone else who requests voter registration information from the Secretary's statewide computerized voter registration list pursuant to section 18.066 of the Election Code.  *See* Tex. Elec. Code Ann. § 18.066; Preliminary Inj. Hr'g Tr. 343–44, June 12, 2012.

For a number of reasons, the answer is no.  First, the entire premise of the Texas VDR scheme is that a completed application in the hands of a VDR is in the government's constructive possession.  VDRs are deputized as government agents when they collect applications.  *See* Tex. Elec. Code Ann. § 13.031; Def. Andrade's Mot. to Dismiss 29 ("[R]eceiving and processing the application is a governmental obligation.").  Moreover, VDRs' behavior is heavily regulated.  They must turn a submitted application in to the county registrar within five days, on pain of criminal prosecution.  *See* Tex. Elec. Code Ann. §§ 13.042–13.043.  As the Secretary has said, "Texas law assumes that the state has the ability to protect that application by regulating how it is handled until it is in the hands of the local registrar."  Def. Andrade's Briefing on First Amendment 2, ECF No. 55.

In any event, the NVRA requires states to make available even those applications that are not in their actual custody.  Congress did not require states to "release" or "turn over" records.  Those words would have indicated that public disclosure was limited to records in the state's physical possession.  But the words chosen, "make available," are more open-ended.  42 U.S.C. § 1973gg-6(i).  States have the power to "make available" for photocopying even those applications they do not possess simply by granting VDRs the legal authority to make photocopies.

And it would be an absurd result to forbid private parties from copying applications before finally submitting them.  Regardless of who physically holds a completed application, it is still a "record" because it contains vital information and is a critical piece in the puzzle of determining whether the voter registration rolls are correct.  *See* 42 U.S.C. § 1973gg-6(i). It makes no sense to forbid someone who has collected a voter registration application from copying that application while it is in their possession but to then allow them to make a copy once the government has received it. That would be to succumb to exactly the "administrative chicanery, oversights, [and] inefficiencies" that the NVRA's public disclosure provision was meant to eliminate.  *Long*, 682 F.3d at 335.

Because the NVRA's Public Disclosure provision directly conflicts with the Secretary's interpretation of Tex. Elec. Code Ann. § 13.038 as a ban on photocopying applications, the Organizational Plaintiffs have shown they are substantially likely to succeed in their preemption challenge to the Photocopying Prohibition.

### c.  The Personal Delivery Requirement

The Election Code states that "[a] volunteer deputy registrar shall deliver in person, or by personal delivery through another designated volunteer deputy, to the registrar each completed voter registration

application submitted to the deputy . . . ."  Tex. Elec. Code Ann. § 13.042(a).

By using the mandatory language "shall," this provision forbids VDRs from

using U.S. mail to deliver the applications they have collected to the

appropriate county registrar.  *See* Pls.' Ex. 1, Letter from Ann McGeehan to

Niyati Shah 5.   Any VDR who violates this ban may be criminally

prosecuted.  Tex. Elec. Code Ann. § 13.043.  Plaintiffs contend that several

NVRA provisions preempt this Personal Delivery Requirement.

The first of these federal provisions, section 1973gg-4(a)(1), states

that "[e]ach State shall accept and use the mail voter registration application

form prescribed . . . pursuant to section 1973gg-7(a)(2) . . . ."   42 U.S.C.

§ 1973gg-4.  This provision demonstrates Congress's determination that the

states allow applicants to use the federal form to register by mail.   The

second of these provisions, 42 U.S.C. § 1973gg-2(a)(2), states that

"notwithstanding any other Federal or State law, in addition to any other

method of voter registration provided for under State law, each State shall

establish procedures to register to vote in Elections for Federal office . . . by

mail application pursuant to section 1973gg-4."  42 U.S.C. § 1973gg-2(a)(2).

By using this exclusive language, this provision sets a floor: while states can

create new forms of registering and means of delivering registrations to the

appropriate county registrar, the federal mail-in application form must be

allowed in all circumstances.  *See Charles H. Wesley Educ. Found. v. Cox*, 408 F.3d 1349, 1354 (11th Cir. 2005).   The third provision, 42 U.S.C. § 1973gg-6(a)(1), requires each state to "ensure that any eligible applicant is registered to vote in an election . . . in the case of registration by mail under section 1973gg-4 . . . if the valid voter registration form . . . is postmarked not later than . . . 30 days . . . before the date of the election."  42 U.S.C. § 1973gg-6(a)(1).  This provision ensures that any valid application submitted by mail will be accepted and result in a properly registered voter even if state law would otherwise forbid that result.  Thus, as the Eleventh Circuit held in *Cox*, "[b]y requiring the states to accept mail-in forms, the [NVRA] does regulate the method of delivery, and by so doing overrides state law inconsistent with its mandates."  *Cox*, 408 F.3d at 1354.

Texas's Personal Delivery Requirement, which forbids VDRs from mailing the applications they have collected, directly conflicts with the NVRA's requirement that states "accept and use" the federal mail-in application form.  42 U.S.C. § 1973gg-4; *see also Project Vote v. Blackwell*, 455 F. Supp. 2d 694, 702 n.6 (N.D. Ohio 2006) ("As drafted and passed, it is arguable that [the Ohio direct return requirement] required personal delivery of voter registration forms.  Such a requirement would clearly run afoul of

the NVRA.").[17]   The Election Code, by requiring the personal delivery of applications by VDRs, makes it a crime for a VDR to follow federal law and mail an application, notwithstanding the fact that improperly mailed forms will still be accepted.   *See* Tex. Elec. Code Ann. §§ 13.071–13.072; Preliminary Inj. Hr'g Tr. 344, 441–42, June 12, 2012.   The NVRA makes no distinction between applications submitted directly by a voter and those submitted by a third party like a VDR.   The Personal Delivery Requirement forbids VDRs from mailing in applications, while the NVRA requires the state to allow them to do so.   Plaintiffs have shown that they have a substantial likelihood of succeeding on the merits of their preemption challenge to the Personal Delivery Requirement.[18]

---

[17] In *Blackwell*, the Ohio Secretary of State mooted the plaintiffs' preemption challenge to the Ohio direct return requirement by agreeing that the statute allowed applications to be delivered by mail.   *Blackwell*, 455 F. Supp. 2d at 702 & n.6.   Nonetheless, the *Blackwell* court ultimately enjoined Ohio's direct return requirement on First Amendment grounds.   *Id.* at 706.

[18] Because Plaintiffs have a substantial likelihood of succeeding on their preemption challenge to the Personal Delivery Requirement, this Court will not address their First Amendment challenge given the principle of avoiding constitutional issues when alternative resolutions are available.   Thus, the Secretary's arguments that the Personal Delivery Requirement imposes only a slight burden on Plaintiffs and is narrowly tailored to further a compelling state interest, arguments that have no bearing on the preemption question, need not be resolved.   *See* Def. Andrade's Mot. to Dismiss. 35–37; Preliminary Inj. Hr'g Tr. 447, 455–56.

### 2. Plaintiffs' Constitutional Challenges

### a. Plaintiffs' Protected Activity and the Standard of Review

The Court next turns to the constitutional challenges. Of the six Election Code regulations at issue in the preliminary injunction stage that this Court has not already addressed, Plaintiffs argue that five violate the First Amendment: (i) the In-State Restriction; (ii) the County Limitation; (iii) the Compensation Prohibition; (iv) the Training Requirement; and (v) the Identification Requirement. This Court finds that Plaintiffs have demonstrated that they are substantially likely to succeed in their First Amendment challenges to the In-State Restriction, the County Limitation, and the Compensation Prohibition.

The Organizational Plaintiffs contend that their voter registration activities are a constitutionally protected form of speech and associational activity. As is well-known, "interactive communication concerning political change" stands at the "zenith" of conduct entitled to First Amendment protection. *Buckley v. Am. Constitutional Law Found., Inc.*, 525 U.S. 182, 186–87 (1999) (quoting *Meyer v. Grant*, 486 U.S. 414, 422, 425 (1988)); *see also Citizens United v. Fed. Election Comm'n*, 130 S. Ct. 876, 898 (2010). "The First Amendment 'was fashioned to assure unfettered interchange of ideas for the bringing about of political and social changes desired by the

people.'"  *Meyer*, 486 U.S. at 421 (quoting *Roth v. United States*, 354 U.S. 476, 484 (1957)).

The Organizational Plaintiffs' registration drives seek political change at the most elemental level.  They encourage citizens to engage in the political process by registering to vote.  Indeed, few messages strike closer to the underlying rationale for First Amendment protection that Justice Brandeis famously articulated:

> Those who won our independence believed that the final end of the state was to make men free to develop their faculties, and that in its government the deliberative forces should prevail over the arbitrary. They valued liberty both as an end and as a means. They believed liberty to be the secret of happiness and courage to be the secret of liberty. They believed that freedom to think as you will and to speak as you think are means indispensable to the discovery and spread of political truth; that without free speech and assembly discussion would be futile; that with them, discussion affords ordinarily adequate protection against the dissemination of noxious doctrine; that the greatest menace to freedom is an inert people; that public discussion is a political duty; and that this should be a fundamental principle of the American government.

*Whitney v. California*, 274 U.S. 357, 375 (1927) (Brandeis, J., concurring).

The Organizational Plaintiffs' communications are closely linked to the promotion of a free and robust political process because what they are encouraging is the exercise of another right—the right to vote, which is "a fundamental political right, because preservative of all rights."  *Reynolds v. Sims*, 377 U.S. 533, 562 (1964) (quoting *Yick Wo v. Hopkins*, 118 U.S. 356,

370 (1886)); *cf. Citizens United*, 130 S. Ct. at 898 ("Speech is an essential mechanism of democracy, for it is the means to hold officials accountable to the people.  The right of citizens to inquire, to hear, to speak, and to use information to reach consensus is a precondition to enlightened self-government and a necessary means to protect it.") (internal citations omitted).  First Amendment scrutiny of laws that regulate political advocacy also guards against the concern that those in power will enact rules of the political game that make it more likely they will retain their power.  *See McConnell v. Fed. Election Comm'n*, 540 U.S. 93, 307–08 (2003) (Kennedy, J., concurring in part and dissenting in part) (arguing that a campaign finance regulation was unconstitutional because it functioned in practice as "an incumbency protection plan").

The Secretary acknowledges that the act of encouraging another citizen to register is a form of protected speech.  Def. Andrade's Mot. to Dismiss 29; Def. Andrade's Briefing on First Amendment 2–3. But, she contends, the challenged regulations do not implicate that right because they only regulate the stage of the voter registration process at which a VDR receives an application and submits it to the elected registrar.  This distinction rests on a couple of erroneous premises.  First, as already noted, the statute that the Secretary reads as an exclusive grant of power to VDRs

to accept and handle applications may very well also be an exclusive grant to "distribute voter registration application forms." Tex. Elec. Code Ann. § 13.038. Second, the Compensation Prohibition is not tied to VDRs but instead imposes criminal sanctions on any person who makes or receives the prohibited forms of payment in exchange for "facilitat[ing]" voter registrations. *Id.* § 13.008. The challenged provisions thus do more than just regulate the application receipt and submission functions that VDRs perform.

But the Secretary's attempt to carve even that conduct outside the scope of the First Amendment fails for a more fundamental reason. She takes far too narrow a view of the First Amendment in arguing that it does not apply to laws regulating only the receipt and submission of applications by VDRs who are participating in registration drives. For one thing, the Supreme Court has applied the Speech Clause to various types of expressive conduct that do not involve pure speech but nonetheless convey a particularized message. *See, e.g.*, *Texas v. Johnson*, 491 U.S. 397, 404–06 (1989) (flag burning); *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 505 (1969) (arm bands to protest the Vietnam War); *Brown v. Louisiana*, 383 U.S. 131, 141–42 (1966) (sit-ins to protest segregation). The messages in those cases are typically political ones, but they are not always

so; the Supreme Court has held that the "outer perimeters" of the First Amendment provide protection even to such expressive conduct as nude dancing. *Barnes v. Glen Theatre, Inc.*, 501 U.S. 560, 565–66 (1991). Federal courts have recognized that the expressive conduct of actually registering voters, to the extent such conduct can be separated from the speech involved in persuading voters to register, is protected expressive conduct. *See, e.g.*, *Am. Ass'n of People with Disabilities v. Herrera*, 690 F. Supp. 2d 1183, 1200 (D.N.M. 2010); *Blackwell*, 455 F. Supp. 2d at 700.

Even more problematic for the Secretary's attempt to avoid the First Amendment is the fact that third-party voter registration activity implicates not just freedom of speech, but also freedom of association. The "freedom to engage in association for the advancement of beliefs and ideas is an inseparable aspect of the 'liberty' assured by the Due Process Clause of the Fourteenth Amendment, which embraces freedom of speech." *NAACP v. Alabama ex rel. Patterson*, 357 U.S. 449, 460 (1958); *see also Kusper v. Pontikes*, 414 U.S. 51, 56–57 (1973) ("There can no longer be any doubt that freedom to associate with others for the common advancement of political beliefs and ideas is a form of 'orderly group activity' protected by the First and Fourteenth Amendments.") (citation omitted). Voter registration drives, in which citizens engage with one another to increase participation in the

54

political process, are paradigmatic associational activity. *See Herrera*, 690 F. Supp. 2d at 1202; *Blackwell*, 455 F. Supp. 2d at 700, 706 ("The interactive nature of voter registration drives is obvious: they convey the message that participation in the political process through voting is important to a democratic society.").

Supreme Court cases applying First Amendment protection to laws regulating those who collect signatures for ballot initiative petitions also reject the Secretary's purported distinction. *See Buckley*, 525 U.S. at 197, 200 (striking down Colorado's requirement that those collecting petition signatures wear a badge and be registered voters); *Meyer v. Grant*, 486 U.S. 414 (1988) (striking down Colorado's ban on paying petition circulators). In those cases, it could be said—just as the Secretary argues here—that the invalidated regulations did not prevent anyone from actually speaking to another citizen in an attempt to persuade her to sign a petition; rather, the regulations just governed the act of collecting the signatures. But Justice Thomas explained why such regulations, those the Secretary says govern only "governmental" conduct, are entitled to First Amendment protection:

> Although Colorado's registration requirement . . . does not *directly* regulate speech, it operates in the same fashion that Colorado's prohibition on paid circulators did in *Meyer*—the requirement reduces the voices available to convey political messages. We unanimously concluded in *Meyer* that initiative petition circulation was core political speech. Colorado's law

> making it a felony to pay petition circulators burdened that
> political expression, we said, because it reduced the number of
> potential speakers.

*Buckley*, 525 U.S. at 210 (Thomas, J., concurring) (emphasis in original)

(citations omitted).   The same reasoning underlies the Supreme Court's

determination that donations to political campaigns are entitled to First

Amendment protection.   *See Buckley v. Valeo*, 424 U.S. 1, 19 (1976) (per

curiam) ("A restriction on the amount of money a person or group can spend

on political communication during a campaign necessarily reduces the

quantity of expression by restricting the number of issues discussed, the

depth of their exploration, and the size of the audience reached.").

The First Amendment likewise applies to the Texas laws at issue in

this case because they "limit[] the number of voices who will convey

[Plaintiffs'] message."   *Meyer*, 486 U.S. at 422; *see also League of Women*

*Voters of Fla. v. Cobb*, 447 F. Supp. 2d 1314, 1332–33 (S.D. Fla. 2006)

("Here, as in *Meyer*, the Third–Party Voter Registration Law has reduced the

total quantum of speech.").   The In-State Requirement excludes millions of

Americans from serving as VDRs in Texas.   The County Limitation

substantially restricts the number of potential voters a VDR can help

register.   And the Compensation Prohibition reduces the number of people

willing to hire VDRs or to work as VDRs because it criminalizes

performance-based pay.   Indeed, as the Secretary concedes, *see* Def. Andrade's Briefing on First Amendment 3–4, every federal court considering the question has rejected her argument and ruled that the voter registration activity in which the Organizational Plaintiffs engage is protected First Amendment conduct. *See League of Women Voters of Fla. v. Browning*, 4:11cv628-RH/WCS, 2012 WL 1957793, at *2 (N.D. Fla. May 31, 2012) ("The assertion that the challenged provisions implicate no constitutional rights is plainly wrong . . . .  This is core First Amendment activity."); *Herrera*, 690 F. Supp. 2d at 1216 ("In short, to participate in voter registration is to take a position and express a point of view in the ongoing debate whether to engage or to disengage from the political process. The Court concludes that the act of voter registration is expressive conduct worthy of First–Amendment protection."); *Blackwell*, 455 F. Supp. 2d at 700 ("[T]he Court is satisfied that participation in voter registration implicates a number of both expressive and associational rights which are protected by the First Amendment.  These rights belong to—and may be invoked by—not just the voters seeking to register, but by third parties who encourage participation in the political process through increasing voter registration rolls."); *Cobb*, 447 F. Supp. 2d at 1334 ("Because the collection and submission of voter registration drives is intertwined with speech and

association, the question is not whether Plaintiffs' conduct comes within the protections of the First Amendment, but whether Defendants have regulated such conduct in a permissible way."); *see also Preminger v. Peake*, 552 F.3d 757, 765 (9th Cir. 2008) ("The parties do not dispute that voter registration is speech protected by the First Amendment.").

But while the State's interest in overseeing the receipt and submission of voter registration applications does not eliminate First Amendment protection, the Supreme Court has recognized that the interest does play a role in the ultimate determination of constitutionality.  There "must be a substantial regulation of elections if they are to be fair and honest and if some sort of order, rather than chaos, is to accompany the democratic processes."  *Storer v. Brown*, 415 U.S. 724, 730 (1974).  Even within the nebulous world of constitutional balancing tests, however, the test the Supreme Court has developed for analyzing election regulations that infringe on First Amendment interests stands out for its indeterminacy:

> [A] court must resolve such a challenge by an analytical process that parallels its work in ordinary litigation. It must first consider the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the plaintiff seeks to vindicate. It then must identify and evaluate the precise interests put forward by the State as justifications for the burden imposed by its rule. In passing judgment, the Court must not only determine the legitimacy and strength of each of those interests; it also must consider the extent to which those interests make it necessary to burden the

plaintiff's rights. Only after weighing all these factors is the reviewing court in a position to decide whether the challenged provision is unconstitutional. The results of this evaluation will not be automatic; as we have recognized, there is no substitute for the hard judgments that must be made.

*Anderson v. Celebrezze*, 460 U.S. 780, 789–90 (1983) (citations and quotations omitted).

The Supreme Court later held that this balancing is not necessary when election laws impose severe burdens, in which case strict scrutiny applies and the restrictions on First Amendment activity must be "narrowly drawn to advance a state interest of compelling importance." *Burdick v. Takushi*, 504 U.S. 428, 434 (1992) (quoting *Norman v. Reed*, 502 U.S. 279, 289 (1992)); *see also Buckley*, 525 U.S. at 192 (applying strict scrutiny); *Meyer*, 486 U.S. at 420 (same).  But when an election law imposes lesser First Amendment burdens, the balancing of interests quoted above, now known as the *Anderson–Burdick* test, applies.  *See Burdick*, 504 U.S. at 434 (stating that "reasonable, nondiscriminatory restrictions" will generally withstand scrutiny) (citation omitted); *see also League of Women Voters of Fla. v. Browning*, 2012 WL 1957793, at *2–*3; (applying the lesser balancing test to regulations of third-party voter registration activities); *Herrera*, 690 F. Supp. 2d at 1214 (same); *Blackwell*, 455 F. Supp. 2d at 701–02 (same); *Cobb*, 447 F. Supp. 2d at 1331–32 (same).

Two of the recently enacted laws being challenged on First Amendment grounds in this case—the In-State Restriction and the Compensation Prohibition—are arguably subject to strict scrutiny. The In-State Restriction is inherently discriminatory. *See Anderson*, 460 U.S. at 792–93 ("[I]t is especially difficult for the State to justify a restriction that limits political participation by an identifiable political group whose members share a particular viewpoint, associational preference, or economic status . . . . The inquiry is whether the challenged restriction unfairly or unnecessarily burdens the availability of political opportunity.") (citation omitted). And the Compensation Prohibition is "an outright ban" on speech "backed by criminal sanctions" that has "the inevitable effect of reducing the total quantum of speech." *Citizens United*, 130 S. Ct. at 897; *Meyer*, 486 U.S. at 423.[19] However, for purposes of ruling on Plaintiffs' motion for a preliminary injunction, this Court uses the *Anderson–Burdick* balancing test because the challenged sections of those two provisions do not survive even under that less exacting scrutiny. It is to that pure balancing test that the Court now turns.

---

[19] Strict scrutiny has been applied in a number of cases where plaintiffs brought First Amendment challenges to compensation bans. *See infra* note 28.

### b.  The In-State Requirement

One of the 2011 amendments to the Election Code provides that only a Texas resident may be appointed a VDR.  *See* Tex. Elec. Code Ann. §§ 13.031(d)(3), 11.002(a)(5).  Because only VDRs can receive, handle, and submit registration applications, this essentially makes it a crime for a nonresident to "touch" a third party's application.  *See id.* § 13.044 (criminalizing "purport[ing] to act" as a VDR without an effective appointment).  This In-State Restriction, believed to be the only one of its kind in the nation, is unlikely to withstand First Amendment scrutiny.

Although the Organizational Plaintiffs generally believe it is more effective to employ local residents as canvassers, the In-State Restriction's ban on employing non-Texas residents as VDRs impedes the Organizational Plaintiffs' ability to effectively staff voter registration drives in Texas.  *See* Pls.' First Am. Compl. ¶ 101, ECF No. 8; Preliminary Inj. Hr'g Tr. 22–23, June 11, 2012.  As the executive director of Project Vote testified, the restriction prevents their employees, who are able to develop expertise from working full-time and around the country in the voter registration field, from supervising the managers and canvassers of their local partner organizations. *See* Preliminary Inj. Hr'g Tr. 24, 61–62, June 11, 2012 ("[W]hat [the In-State Restriction] essentially says is our national managers can't have a

hands-on role in the voter registration process or the management of this work.  And that is their best value, is the fact that they can do hands-on work.  So it really prohibits our assistance in troubleshooting or identifying problems . . . .  [The In-State Restriction] reduces our ability to be hands-on and look for problems.").

History demonstrates the importance of allowing Americans the freedom to promote voter registration throughout the nation.  The Mississippi Freedom Summer of 1964, one of the most famous voter registration drives in this country's history, involved hundreds of out-of-state residents working with local African-Americans to end that state's history of pervasive racial discrimination in voting.  *See* JOHN DITTMER, LOCAL PEOPLE: THE STRUGGLE FOR CIVIL RIGHTS IN MISSISSIPPI 215–71 (1994).  The astounding transformation of African-American political participation in Mississippi that the Freedom Summer helped launch—by 2002, Mississippi had the most elected African-Americans of any state[20]—demonstrates the power of voter registration drives and in particular of one that relied heavily on out-of-state participants.

---

[20] *See Table 413: Black Elected Officials by Office and State, 1970 to 2002, and State, 2002*, UNITED STATES CENSUS BUREAU: THE 2011 STATISTICAL ABSTRACT, *available at* http://www.census.gov/compendia/statab/2011/tables/11s0413.pdf (listing 950 elected African-American officials in Mississippi with Alabama at second place with 757 elected African-American officials) (last visited July 26, 2012).

The State has not specified any interest in this criminal prohibition that would have rendered Freedom Summer illegal, let alone a weighty one. Defendant Andrade asserts conclusory claims that "regulatory interests" justify the In-State Restriction and that the Election Code generally "protect[s] the right to vote."  Def. Andrade's Mot. to Dismiss 37; Def. Andrade's Briefing on First Amendment 5.  In fact, the only state interest either Defendant has articulated as a justification for the In-State Restriction came in response to the Court's direct questioning during the preliminary injunction hearing:

> THE COURT: What's the state interest with the instate restrictions?  Is it one of the new statutes?
>
> [THE SECRETARY]: I think there the Legislature is assuming that people in Texas are going to—are going to take better care of their—of their fellow citizens' registration forms than people from out of state.  And given the sort of well publicized problems with other voter registration organizations coming in from out of state, I'm not—that's a perfectly reasonable conclusion.

Preliminary Inj. Hr'g Tr. 457, June 12, 2012.

But any state interest in restricting nonresidents from acting as VDRs is not a strong one.  First, it may be more logical to surmise—and surmising is all the state has done in asserting an interest behind the In-State Restriction—that in-state residents are more prone to commit fraud because they are more likely to be passionate about certain local candidates and

causes.  Moreover, the training requirement eliminates any concern that out-of-state residents will be unfamiliar with Texas law.  And the state has not produced evidence showing that rampant fraud by out-of-state VDRs existed in pre-2011 Texas elections or continues to exist in those states that permit all Americans to engage in the voter registration activities protected by the First Amendment.

Of course, only Texas residents may actually register and vote in Texas elections.  But there is a host of other activities aimed at influencing the political process—making speeches, donating money to campaigns, or drafting and distributing campaign literature, to name just a few—that non-Texans are allowed to perform.  The state has not justified its singling out of third-party voter registration activity as the one area of campaign activity off-limits to Americans from other states.  And the draconian nature of this unique, complete ban on non-Texans becoming VDRs is certainly not a narrowly tailored attempt at curtailing fraud that out-of-state canvassers may commit.

Plaintiffs have shown that the In-State Restriction imposes a substantial burden on their First Amendment rights, and Defendants have not been able to explain how it substantially advances a legitimate state interest.

Plaintiffs therefore have demonstrated a substantial likelihood of establishing that the In-State Restriction violates the First Amendment.

### c.  The County Limitation

Tex. Elec. Code Ann. § 13.038 states that "[a] volunteer deputy registrar may distribute voter registration application forms throughout the county and receive registration applications submitted to the deputy in person."  The Secretary argues that this grant of power is exclusive, such that it impliedly bans any person from accepting or handling applications from residents of counties other than the county in which the person is appointed as a VDR.  *See* Pls.' Ex. 1, Letter from Ann McGeehan to Niyati Shah 4.  Under this interpretation, which the Court accepts at this stage of the proceeding, a VDR must be appointed in every county in which any applicant who submits an application to her resides.  And because the training requirement appears to be tied to the appointment process with a particular county's registrar, *see* Tex. Elec. Code § 13.031(e), this also means that a VDR must complete training in every county in which she is appointed.

Under the *Anderson–Burdick* balancing analysis, Plaintiffs have demonstrated that the County Limitation imposes heavy administrative burdens on organizations that conduct voter registration drives.  *See* Pls.'

First Am. Compl. ¶¶ 103–104.  It does so by forcing organizations engaged in large-scale registration efforts to have their canvassers and managerial staff appointed and trained as VDRs in multiple counties.  *See id.* ¶ 103.  As Plaintiffs have pointed out, a VDR active only in the City of Dallas would need to be appointed in Dallas, Denton, Collin, Rockwall, and Kaufman Counties in order to legally accept applications from residents of all parts of the city.  Pls.' Opp. To Defs.' Mots. to Dismiss and Supporting Memo. of Law 31, ECF No. 25.  The fact that VDRs working in certain areas, such as downtown business districts populated by commuters, are very likely to receive applications from applicants domiciled in other counties compounds this problem.  Preliminary Inj. Hr'g Tr. 45–46, June 11, 2012.  For example, a VDR engaged in voter registration activities in downtown Houston is likely to receive applications not just from Harris County residents, but also from residents of Montgomery, Fort Bend, Galveston, and other surrounding counties.

The fact that Texas has 254 counties, by far the most of any state and a large number even taking account of the state's vastness,[21] magnifies the burden the County Limitation imposes.  A registration drive seeking to

---

[21] Texas has nearly 100 more counties than the state with the next highest number, Georgia, which has 159 counties.  Other large states have far fewer counties than does Texas.  Alaska and Montana have 18 "boroughs" and 56 counties, respectively, while California has 58 counties.  *See Find a County*, Nat'l Ass'n of Cntys. (2012), http://www.naco.org/Counties/Pages/FindACounty.aspx (last visited July 26, 2012).

significantly increase statewide voter registration—the goal of the Organizational Plaintiffs—would thus likely need to have canvassers and supervisors appointed in scores of counties.   Drives associated with statewide and congressional campaigns would also require VDR appointments in a large number of counties.   During the most recent congressional elections (2010), the Fourteenth Congressional District encompassed territory in ten counties, including the four that make up this Court's division.[22]   Another district, the Panhandle's Thirteenth, contained all or part of forty-four counties.[23]   The county limitation, by requiring both registration and training in any county in which a potential VDR wishes to submit applications, thus imposes severe time burdens and administrative expenses on voter registration activity.

With respect to the County Limitation, the state cannot put much weight on its side of the *Anderson–Burdick* seesaw.   State, not county, law governs voter registration, so there are not county specific issues involved in

---

[22]   The counties in the Fourteenth Congressional District were Aransas, Brazoria, Calhoun, Chambers, Fort Bend, Galveston, Jackson, Matagorda, Wharton, and Victoria Counties.   *See Census 2010,* TEXAS REDISTRICTING, http://www.tlc.state.tx.us/redist/ current_census_2010.html (last visited July 12, 2012).

[23]   These were Archer, Armstrong, Baylor, Briscoe, Carson, Childress, Clay, Collingsworth, Cooke, Cottle, Crosby, Dallam, Dickens, Donley, Foard, Gray, Hall, Hansford, Hardeman, Hartley, Haskell, Hemphill, Hutchinson, Jack, Jones, King, Knox, Montague, Moore, Motley, Lipscomb, Ochiltree, Oldham, Palo Pinto, Potter, Randall, Roberts, Sherman, Stonewall, Swisher, Throckmorton, Wheeler, Wichita, and Wilbarger Counties.   *See id.*

either VDR appointment or training.  Indeed, the statute requires the Secretary of State to issue statewide training standards for county registrars to follow.  *See* Tex. Elec. Code Ann. § 13.047.  A VDR required to undergo appointment and training in multiple counties would thus simply be repeating the same routine.

The Secretary argues that the County Limitation helps prevent fraud by making local county registrars more aware of the VDRs active in their counties.  But with or without the County Limitation, county registrars are only likely to be able to tie particular VDRs to the applications the VDR personally submitted.[24]  Even when a VDR appointed in County X submits applications via mail or hand delivery to the registrar in County Y, the County Y registrar will still know the identity of the person making the submission.  Mandatory county-by-county appointment and training therefore has only a tenuous connection to increasing the ability of registrars to track applications.  Moreover, the Secretary was unable to identify any other state having a similar county-by-county appointment or training requirement.  Because there is no evidence or reason to believe that the practices of all the other states, which do not require appointment of

---

[24] The Identification Requirement, which this order does not enjoin, is the mechanism available for individuals to report any suspicious presubmission VDR activity to county registrars.  *See* Tex. Elec. Code Ann. § 13.033.

individual registrars let alone on a county-by-county basis, have a higher incidence of voter registration fraud than Texas, Defendants are unable to show that the County Limitation plays a meaningful role in combating fraud.

Given the substantial burden the County Limitation imposes on large-scale voter registration activity and the negligible connection the provision has to the state interest in fraud prevention, the Organizational Plaintiffs are substantially likely to prevail on this First Amendment challenge.

### d.  The Compensation Prohibition

#### i.    Overview and Scope of the Challenged Provisions

The Organizational Plaintiffs seek to enjoin part of the recently enacted Compensation Prohibition.  The provision, titled "Performance-based Compensation for Registering Voters Prohibited," criminalizes many employment actions by persons who pay others to conduct voter registration activities.  Tex. Elec. Code Ann. § 13.008.  Unlike the other statutes challenged in this case, the Compensation Prohibition is not limited to those seeking to receive and submit third-party applications (i.e., those who must become VDRs under the Secretary's interpretation of Texas law); it applies to anyone involved in voter registration activity who pays or receives the prohibited forms of compensation.

The Compensation Prohibition has the following three subparts:

- A ban on "compensat[ing] another person based on the number of voter registrations that the other person successfully facilitates." Tex. Elec. Code Ann. § 13.008(a)(1);

- A ban on "present[ing] another person with a quota of voter registrations to facilitate as a condition of payment or employment." *Id.* § 13.008(a)(2); and

- A ban on "engag[ing] in another practice that causes another person's compensation from or employment status with the person to be dependent on the number of voter registrations that the other person facilitates." *Id.* § 13.008(a)(3).

The statute's fourth subsection bans any person from accepting compensation for an activity described in the first three subsections. *Id.* § 13.008(a)(4). A violation of any of these four subsections is a Class A misdemeanor punishable by up to a $4,000 fine, a year's imprisonment, or both. *Id.* § 13.008(b); Tex. Penal Code Ann. § 12.21. If the person committing an offense is an entity, the entity's officers, directors, or other agents can be held strictly liable for the offense. Tex. Elec. Code Ann. § 13.008(c).

The Organizational Plaintiffs do not challenge the prohibition on paying canvassers per application collected, because that is not a practice they employ. Preliminary Inj. Hr'g Tr. 103–04, June 11, 2012. And courts of appeals, in the context of petition drives, have upheld similar bans on per-signature payments as narrowly tailored at eliminating a financial incentive for fraud. *See, e.g.*, *Person v. N.Y. State Bd. of Elections*, 467 F.3d 141, 143

(2d Cir. 2006); *Prete v. Bradbury*, 438 F.3d 949, 969–71 (9th Cir. 2006). But the Organizational Plaintiffs contend that the rest of the Compensation Prohibition severely burdens their ability to conduct registration drives by preventing them from rewarding or punishing employees based on performance as most effective businesses are able to do. *See* Pls.' Am. Compl. ¶¶ 96–98, 106–113; Preliminary Inj. Hr'g Tr. 209, June 12, 2012.

Because the Organizational Plaintiffs typically engage in large-scale registration drives aimed at substantially increasing the voter rolls in targeted communities, they rely on paid canvassers. Preliminary Inj. Hr'g Tr. 69–70, June 11, 2012. The Organizational Plaintiffs pay their canvassers hourly wages. They do not pay canvassers per application or set predetermined target numbers of applications that their canvassers must collect as a condition of payment. *Id.* at 58, 103–04. But the Organizational Plaintiffs argue that the Compensation Prohibition nevertheless makes it effectively impossible for them to conduct large-scale voter registration drives in Texas. *Id.* at 69–70. They argue that it exposes them to criminal prosecution if they terminate or otherwise discipline a canvasser who, through lack of either effort or skill, performs poorly by collecting an inadequate number of applications. *Id.* at 57–58. For example, the Organizational Plaintiffs contend the Compensation Prohibition makes it a

crime to fire an employee who, after a full month of canvassing, has only registered a handful of voters despite working more than a hundred hours. This would be a serious burden on the Organizational Plaintiffs because "some canvassers simply cannot meet any sort of standards" and, without the ability to discipline or terminate canvassers for poor performance, the Organizational Plaintiffs would "go broke if [they] kept them on staff." *Id.* at 59. Conversely, the Compensation Prohibition prevents the Organizational Plaintiffs from promoting or increasing the pay of a canvasser who is especially hardworking or competent.

It is first necessary to determine whether the statute actually criminalizes such performance-based employment decisions. The Secretary argues that the Compensation Prohibition only criminalizes two practices: (1) paying canvassers on a per-application basis and (2) conditioning payment or employment solely on the submission of a preset number of applications. *See* Preliminary Inj. Hr'g Tr. 211–12, 451–52, June 12, 2012; Def. Andrade's Postsubmission Br. 3, ECF No. 60. She argues that the statute does not ban terminations or adverse employment actions based on a retrospective, generalized review of a canvasser's performance. *See* Preliminary Inj. Hr'g Tr. 211–12, 451–52, June 12, 2012.

72

The Court is mindful that no Texas court has interpreted section 13.008, and thus this Court must accept "any narrowing construction or practice to which the law is fairly susceptible." *City of Lakewood v. Plain Dealer Publ'g Co.*, 486 U.S. 750, 770 n.11 (1988).   However, the Secretary's construction would render subsection (a)(3) superfluous.  *See United States v. Stevens*, 130 S. Ct. 1577, 1592 (2010) ("To read [the challenged statute] as the Government desires requires rewriting, not just reinterpretation.").   Subsection (a)(3), the broader of the two challenged subsections, unambiguously applies to commonplace performance-based employment decisions: any person who terminates a canvasser for collecting an inadequate number of applications, or promotes a canvasser to a managerial role for successfully bringing in an extraordinary number of applications, would violate the prohibition on "engag[ing] in another practice that causes another person's . . . employment status with the person to be dependent on the number of voter registrations that the other person facilitates."   Tex. Elec. Code Ann. § 13.008(a)(3).   At the preliminary injunction hearing, the Secretary struggled to explain how this provision could be read any other way.  *See* Preliminary Inj. Hr'g Tr. 211–16, 451–56, June 12, 2012.  If read in the narrow manner the Secretary proposes—i.e., limited to preventing payment per application and adverse employment

actions based solely on the failure to meet predetermined "quotas"—subsection (a)(3) would not add anything to the two preceding subparts.

Subsection (a)(2), which bans "present[ing] another person with a quota of voter registrations to facilitate as a condition of payment or employment," is not as expansive as subsection (a)(3), but it still prohibits the Organizational Plaintiffs from disciplining canvassers for poor performance based on low productivity. Tex. Elec. Code Ann. § 13.008(a)(2). The Court agrees with the Secretary that (a)(2)—unlike subsection (a)(3)—may fairly be read as applying only to preset, prospective performance goals. "Condition" is commonly defined as a condition precedent that contemplates future performance. *See Condition*, MERRIAM-WEBSTER, www.merriam-webster.com/definition/condition (defining "condition" as both "a premise upon which the fulfillment of an agreement depends" and "something essential to the appearance or occurrence of something else") (last visited Aug. 1, 2012). And the word "presenting," as opposed to a broader term like "using" or "applying," can be read as limited to quotas announced prior to performance. Thus, subsection (a)(2) can be fairly read as applying to informing canvassers that their (i) pay or (ii) employment is dependent on the number of applications received in the future.

74

The Secretary focuses on the first part of subsection (a)(2), arguing that telling a canvasser they will not be paid unless they receive a certain number of applications creates fraud incentives similar to the pay-per-application practice.   But the latter part—the ban on conditioning "employment" on the number of applications collected—remains problematic in that it would continue to ban ordinary performance-based employment decisions.  Numbers-based and performance-based terminations are often one and the same as the following examples demonstrates. Assume after conducting performance reviews that the Organizational Plaintiffs determine that a canvasser has only collected two applications in the preceding month.   They meet with the canvasser and, following a standard business practice, implement a performance-improvement plan that notifies the canvasser that he will be terminated unless he is more productive.  *See* Preliminary Inj. Hr'g Tr. 58–61, June 11, 2012 (discussing the training and "second chance" that Plaintiffs provide for poor performers).   In the month that follows, the canvasser only submits one application and is fired for not improving.  Subsection (a)(2), even when read to apply only to setting prospective numbers-based performance requirements as a condition of future employment, would still ban this common performance-based employment action.  It would also criminalize

an organization's practice of requiring some bare minimum level of productivity—even if the level were set well below average productivity levels, including requiring the collection of a single application during an eight-hour shift—as a condition of payment or continued employment.

At the hearing, the Secretary seemed to understand that prohibiting such ordinary business practices was problematic and tried to argue that subsection (a)(2) only prohibits excessively high quotas and not the termination of low-performing employees discussed above. *See* Preliminary Inj. Hr'g. Tr. 215, June 12, 2012. But the Secretary does not identify where to draw the line between impermissibly high and acceptably low numbers for use in evaluating performance. In any event, there is no textual basis for reading any such demarcation into the statute. Thus, while subsection (a)(2) encompasses conduct in which Plaintiffs do not engage, including the setting of the "high" quotas that the Secretary contends creates fraud incentives similar to payment-per-application practices, it also reaches customary performance-based employment practices that Plaintiffs utilize and contend are protected First Amendment activity.

This statutory analysis confirms that the Compensation Prohibition bans many performance-based decisions. Subsection (a)(3)'s primary aim is such conduct and, as discussed above, even when read narrowly subsection

(a)(2) reaches a substantial amount of these common business practices and thus is susceptible to an overbreadth challenge. *See Stevens*, 130 S. Ct. at 1587 (stating that in the First Amendment context, "a law may be invalidated as overbroad if 'a substantial number of its applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep'") (quoting *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 449 n.6 (2008)).  The Court now proceeds to the First Amendment inquiry and will assess the burden that subsections 13.008(a)(2) and (3) impose upon the Organizational Plaintiffs by criminalizing their conduct and the degree to which the prohibitions further Texas's interest in fraud prevention.

### ii.    Plaintiffs' Burden

Other courts have recognized that prohibiting performance-based employment practices severely burdens First Amendment activity. *See Citizens for Tax Reform v. Deters*, 518 F.3d 375, 385–87 (6th Cir. 2008); *Project Vote v. Kelly*, 805 F. Supp. 2d 152, 166–67 (W.D. Pa. 2011) (interpreting a Pennsylvania compensation ban to avoid what even the Pennsylvania Attorney General conceded would be constitutional problems with a law preventing voter registration organizations from terminating

unproductive workers).[25]  Indeed, as an "outright ban, backed by criminal sanctions," the Compensation Prohibition is one of the more burdensome types of First Amendment restrictions.  *Citizens United*, 130 S. Ct. at 897.  It prevents the Organizational Plaintiffs from terminating ineffective employees whose efforts are not worth the wages paid or from rewarding those who are particularly effective.[26]

Impeding the ability to make performance-based employment decisions inevitably diminishes the number of voters the Organizational Plaintiffs may register.[27]  As the Sixth Circuit explained in striking down an Ohio compensation prohibition that banned "pay[ing] any other person for collecting signatures on election-related petitions or for registering voters except on the basis of time worked":

---

[25] In *Kelly*, the Western District of Pennsylvania rejected a challenge to a Pennsylvania compensation ban much narrower than Texas's.  *See Kelly*, 805 F. Supp. 2d at 170.  The Pennsylvania law in *Kelly* prohibited only the "payment or financial incentive to obtain a voter registration if the payment or incentive is based upon the number of registrations or applications obtained."  *Id.* at 158.  In that case, the Pennsylvania Attorney General conceded that the law would be unconstitutional if it banned the Organizational Plaintiffs from terminating unproductive workers.  *Id.* at 166–67.  The *Kelly* court found that the burden on the Organizational Plaintiffs was *de minimis* and upheld the ban, but only after construing the statute to only prohibit per-application compensation.  *Id.* at 170–71, 181.

[26] This is partially because there are no good alternative means of detecting ineffective canvassers.  *See* Preliminary Inj. Hr'g Tr. 58, June 11, 2012 ("[T]hat's the only measurement we have that someone has gone out and talked to people.").  The number of applications a canvasser collects is a quantitative benchmark that can easily and efficiently be used to judge that canvasser's performance; other methods—such as direct supervision of the canvasser in the field—require significant time and money, thereby reducing the amount of resources devoted to actual registration activity.

[27] Plaintiffs' expert witness, Dr. Rousseau, made this point clear in her testimony.  As Dr. Rousseau noted, an organization that could not fire unproductive canvassers would "[o]bviously be less effective."  Preliminary Inj. Hr'g Tr. 251, June 12, 2012.

> Under a plain reading of [the Ohio law, petitioners] could not give a bonus to a circulator based on productivity or longevity. [Petitioners] could not set a minimum signature requirement . . . .   Arguably, [petitioners] could not terminate a circulator who consistently did not collect enough signatures because, again, to earn a wage (and keep the job) the circulator would, among other things, have to collect a minimum number of signatures . . . .
>
> . . . .
>
> . . .   [W]hen [petitioners'] means are limited to volunteers and to paid hourly workers who cannot be rewarded for being productive and arguably cannot be punished for being unproductive, they carry a significant burden in exercising their right to core political speech.

*Deters*, 518 F.3d at 377–78, 385–87.

The Compensation Prohibition means that funds that could be used to hire productive canvassers will instead be absorbed by unproductive employees who could not be fired as a result of a performance evaluation taking account of their level of success in collecting applications.  Indeed, the longer a drive lasts, the more likely it is to accumulate deadweight employees, particularly once word spreads that termination is impossible based on poor performance.  Such a result would not only decrease the number of voter registrations that the Organizational Plaintiffs could facilitate in a given drive; it would also make it more difficult for them to convince their donors to provide the financial support necessary for future drives, and it poses a risk of forcing them to cease large-scale voter registration drives.  Preliminary Inj. Hr'g Tr. 21, June 11, 2012.  Each of

these results "limits the number of voices who will convey [Plaintiffs'] message and the hours they can speak and, therefore, limits the size of the audience they can reach."  *Meyer*, 486 U.S. at 422–23 (striking down Colorado's ban on paid petition circulators).

It is no consolation that the Organizational Plaintiffs can still use unpaid volunteers without running afoul of the Compensation Prohibition, just as it was no saving grace in *Citizens United* that a corporation banned from speaking directly could still speak through a Political Action Committee ("PAC").  *See Citizens United*, 130 S. Ct. at 897 ("Section 441b is a ban on corporate speech notwithstanding the fact that a PAC created by a corporation can still speak.").  PACs were "burdensome alternatives" that were "expensive to administer" when compared to direct speech; so too, the evidence shows, are unpaid volunteers when compared to paid canvassers. *Id.*; Preliminary Inj. Hr'g Tr. 69–70, June 11, 2012.

As noted, the language of sections 13.008(a)(2) and (3), even narrowly construed, bans Plaintiffs from taking many performance-based disciplinary actions.  Like the broad compensation bans in *Deters* and *Meyer*, the Compensation Prohibition has "the inevitable effect of reducing the total quantum of speech" in which the Organizational Plaintiffs may

engage.  *Meyer*, 486 U.S. at 423.  It imposes a severe burden upon their constitutionally protected activities.

### iii.    Defendants' Legitimate Interest

Although there is a compelling argument that strict scrutiny applies to this Compensation Prohibition,[28] subsections (a)(2) and (3) of the Compensation Prohibition fall even under the *Anderson–Burdick* balancing test and thus it is not necessary at this preliminary stage to rule whether strict scrutiny applies.  Defendants have advanced a legitimate state interest for the Compensation Prohibition: the need to combat voter registration fraud.  *See* Def. Andrade's Mot. to Dismiss 35.  The Organizational Plaintiffs agree that this is a legitimate interest, and that a ban on paying compensation per application—as is included in section 13.008(a)(1) and which Plaintiffs do not challenge—serves this interest.  Preliminary Inj. Hr'g Tr. 59–60, 107, June 11, 2012.  But they disagree that a ban on many commonly accepted performance measures furthers the state's interest.

At the preliminary injunction hearing, the Secretary argued that the state's legitimate goal of preventing voter registration fraud was advanced

---

[28] As it was applied to compensation bans in *Meyer*, 486 U.S. 414 (an absolute ban on paid petition circulators), *Deters*, 518 F.3d 375, 377 (a ban on paying for signatures or registrations "except on the basis of time worked"), *Idaho Coalition United for Bears v. Cenarrusa*, 234 F. Supp. 2d 1159 (D. Idaho 2001) (a ban on paying petition circulators per signature), *Term Limits Leadership Council, Inc. v. Clark*, 984 F. Supp. 470 (S.D. Miss. 1997) (same), and *Limit v. Maleng*, 874 F. Supp. 1138 (W.D. Wash. 1994) (same).

by a ban on the use of arbitrarily high quotas but was not advanced by a ban on productivity goals and performance standards.  She stated that this is because only impossibly "high" quotas create significant incentives for fraud.  Preliminary Inj. Hr'g Tr. 215, June 12, 2012 ("[E]very job comes with [pressure] to perform. . . .  [T]hat normal sort of pressure is fine.  It's the idea of tying that pressure specifically to a very high quota of voter registration applications that I think the Legislature was getting at, because that's when you've got pressure to start getting names out of the phone book and Mickey Mouse and whoever.").  The Secretary thus appeared to concede that the state's interest does not justify a complete ban on basing employment decisions—good or bad—on performance as measured by the number of applications collected, which is why she instead argued for a narrowed reading that only banned impermissibly high quotas.

But, as discussed above, assuming that the state's interest in preventing fraud is advanced by a ban on the use of unrealistically high, arbitrary quotas, subsections 13.008(a)(2) and (3) extend beyond such quotas to prohibit commonly accepted employment practices.  They ban exactly the kinds of performance-based employment actions not typically associated with fraud, actions that even the Secretary seems to concede are a necessary part of normal workplace discipline.

Furthermore, the fact that the Texas provision sweeps more broadly than the laws in other states, coupled with the fact that there is no evidence showing that fraud is more endemic in those states than in Texas, undermines the argument that this new law is necessary to combat fraud. Also telling is that Texas had no compensation prohibition—even the ban on paying per application—prior to 2011 and yet the Secretary did not produce evidence of fraud resulting from such practices.  The state's interest is certainly not so well served by the ban that it warrants the chilling effect it places on voter registration activity by prohibiting effective performance reviews of paid canvassers.  *See Anderson*, 460 U.S. at 789 ("In passing judgment, the Court must not only determine the legitimacy and strength of each of [the state's] interests; it also must consider the extent to which those interests make it necessary to burden the plaintiff's rights.").  The Organizational Plaintiffs have demonstrated a substantial likelihood of succeeding on the merits of their First Amendment challenges to the second and third subsections of the Compensation Prohibition.

### 3. The Remaining Challenges Do Not Meet the "Substantial Likelihood" Standard on the Present Record

With respect to the Organizational Plaintiffs' preemption and constitutional challenges to the Completeness, Training, and Identification

Requirements, the Court concludes that, on the present record, Plaintiffs have not shown a substantial likelihood of success.   Some of these challenges appear more substantial than others, but at present none rise to the high threshold for likely success that the law requires for granting preliminary relief.   Consideration of the closer calls may also benefit from further development of the factual record.   To cite just one example, the burden imposed by the Training Requirement depends in large part on the frequency at which counties provide training opportunities.   At the time of the briefing and hearing on the motion for preliminary injunction, the Training Requirement was newly implemented with little track record. Thus, because of the need for further evidence and the fact that "a preliminary injunction is an extraordinary remedy which should not be granted unless the party seeking it has clearly carried [its] burden of persuasion," *Bluefield Water Ass'n, Inc. v. City of Starkville*, 577 F.3d 250, 253 (5th Cir. 2009) (quotations omitted), a preliminary injunction shall not issue on the Organizational Plaintiffs' remaining claims.

## B. Second Factor—Irreparable Injury

Returning to all the preemption and constitutional claims discussed above on which the Organizational Plaintiffs have demonstrated a substantial likelihood of success, irreparable harm will result if a preliminary

injunction is not issued. Plaintiffs presented a significant amount of testimonial and documentary evidence detailing how the challenged provisions of the Election Code prevent them from conducting effective voter registration activities in Texas. So long as the provisions remain in force, the likely violations of Organizational Plaintiffs' statutory and constitutional rights continue, and they remain unable to engage in their chosen form of political speech and associational activity.

This finding of irreparable injury tracks the decision of every other federal case in which courts determined that challenges to regulations on third-party voter registration activity were substantially likely to succeed. As the court stated in granting a preliminary injunction against Florida's 48-hour voter registration delivery requirement in *League of Women Voters of Fla. v. Browning*, 2012 WL 1957793, "[t]he plaintiffs will suffer irreparable harm if an injunction is not issued, first because the denial of a right of this magnitude under circumstances like these almost always inflicts irreparable harm, and second because when a plaintiff loses an opportunity to register a voter, the opportunity is gone forever." *Id.* at *11; *see also Blackwell*, 455 F. Supp. 2d at 707–08 ("But for the issuance of an injunction, Plaintiffs will continue to be dissuaded from engaging in an important political activity, and will no longer enjoy the freedom they once had to enthusiastically

register Ohio citizens to vote, and to encourage participation in the electoral process."); *Cobb*, 447 F. Supp. 2d at 1340 ("Plaintiffs have suffered and will continue to suffer irreparable harm unless the Court enjoins the challenged statute.  The undisputed evidence demonstrates that Plaintiffs have halted or significantly scaled back their voter registration operations and are losing valuable time to engage in core political speech . . . ."); *Charles H. Wesley Educ. Found. v. Cox*, 324 F. Supp. 2d 1358, 1368 (N.D. Ga. 2004) ("[N]o monetary remedy can correct the fact that the applications . . . were improperly rejected nor will a monetary remedy prevent the state from rejecting similar applications in the future.").  With respect to Plaintiffs' First Amendment challenges, the conclusions of these district courts in voter registration cases are consistent with the Supreme Court's broader pronouncement that the "loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976); *see also Palmer ex rel. Palmer v. Waxahachie Indep. Sch. Dist.*, 579 F.3d 502, 506 (5th Cir. 2009) (quoting *Elrod* in finding that the district court abused its discretion in holding that the claimed First Amendment injury could not irreparably harm the plaintiff).

Plaintiffs have succeeded in showing that they will suffer irreparable harm if a preliminary injunction does not issue.

### C.  Third Factor—Balancing of Harms

The balancing of harms also favors the granting of a preliminary injunction.  As already noted, Plaintiffs have presented substantial evidence showing that, unless an injunction issues, they will not be able to exercise their statutory and constitutional rights and will suffer irreparable injury. *See, e.g.*, Preliminary Inj. Hr'g Tr. 51–53, June 11, 2012 (testifying that the photocopying prohibition stops the Organizational Plaintiffs from ensuring that applicants are properly registered and reduces their ability to detect fraud); *id.* at 48 (testifying that the Personal Delivery Requirement could increase operational costs in rural areas); *id.* at 61–62 (testifying that the In-State Restriction reduced the Organizational Plaintiffs' ability to identify canvassing problems and detect fraud); *id.* at 46 (testifying that the County Limitation meant that the Organizational Plaintiffs could not conduct voter registration drives without exposing themselves to prosecution); *id.* at 59 (testifying that the Compensation Prohibition would force the Organizational Plaintiffs to keep unproductive employees on staff and "go broke").

Defendants, by contrast, presented no evidence that would allow this Court to find that an injunction would do substantial harm to their interests

or the interests of the people of Texas.  The Secretary offered no witnesses or documentary evidence at all.  There is thus no evidence in the record documenting the magnitude of any voter registration fraud in Texas or, more importantly, how the prohibited practices are tied to such fraud.  *See Buckley*, 525 U.S. at 210 (Thomas, J., concurring) ("In any event, the State has failed to satisfy its burden demonstrating that fraud is a real, rather than a conjectural, problem.").

The recency of the In-State Restriction and Compensation Prohibition means that the Secretary does not have to hypothesize about a world in which these prohibitions do not exist.  Such a world, which allowed the now-banned compensation practices and VDR appointment of non-Texans, existed for every general election in Texas history prior to 2011.  If these practices did contribute to fraud, concrete examples of such fraud would likely exist from these decades of experience.[29]  With respect to the longer standing provisions such as the County Limitation, the Secretary has pre-1987 Texas elections and the experience of all the states that do not require county-by-country appointment of those handling third-party applications

---

[29] Indeed, the only evidence on this point is the testimony of Governor White: "[T]he history in Texas has been that individual voters are not likely to commit any violation of the law.  It's much more highly, much more historically correct to say that the administrators of the election are the ones that are most likely to violate the law or abuse the law."  Preliminary Inj. Hr'g Tr. 293, June 12, 2012.

from which to draw evidence of fraud.  But no such evidence was introduced for the Court to weigh against the harm to Plaintiffs.[30]

Voter registration fraud is illegal in Texas.  An injunction would not interfere with any attempt to prosecute anyone who knowingly creates or submits a fraudulent voter registration application.  *See* Tex. Elec. Code Ann. § 13.007 (stating that a person commits an offense if he or she "knowingly makes a false statement or requests, commands, or attempts to induce another person to make a false statement on a registration application").  But the Defendants have not demonstrated that the challenged provisions are needed to buttress the direct tool of preventing fraud by prosecuting those who actually engage in fraud.

As Judge Gibbons of the Sixth Circuit stated in her concurring opinion in *Ohio Republican Party v. Brunner*, "[b]ased on the Secretary's representations in the district court, the only public harm at issue was that asserted by the plaintiffs.  There was no suggestion and certainly no

---

[30] Moreover, evidence at the injunction hearing showing inconsistent or lax enforcement of the VDR appointment scheme undercuts the Defendant's argument that the scheme plays an important role in combating fraud.  Galveston County is allowing certain non-VDRs to submit third-party applications.  Galveston incorrectly believes that any individual can serve as an "agent" under section 13.003 and deliver an application if she has the applicant's permission to do so—a belief which flatly conflicts with section 13.003(b)'s requirement that an agent be a qualified voter who is the spouse, parent, or child of the applicant.  Preliminary Inj. Hr'g Tr. 342, June 12, 2012.  Galveston's practice of not strictly following the VDR scheme casts doubt on the Secretary's claim that enforcement of the scheme plays a vital role in combating fraud.

evidence that granting the plaintiffs' request might disrupt the electoral process or harm the public in any way."  544 F.3d 711, 723 (6th Cir. 2008) (Gibbons, J., concurring), *vacated on other grounds*, 555 U.S. 5 (2008).  The substantial injury that the challenged provisions impose on the Organizational Plaintiffs outweighs any harm to the state that might result from the issuance of a preliminary injunction.

### D. Fourth Factor—The Public Interest

Finally, granting a preliminary injunction will serve the public interest.  Enjoining the challenged statutes would ensure "[t]he vindication of constitutional rights and the enforcement of a federal statute," an achievement which "serve[s] the public interest almost by definition." *League of Women Voters of Florida v. Browning*, 2012 WL 1957793, at *11. As another federal district court reasoned when enjoining less burdensome regulations in Ohio:

> Because the restrictions on voter registration activities outlined above, viewed separately or in combination, do not promote the exercise of the right to vote but, rather, chill the exercise of that right through an unusual and burdensome maze of laws and *penalties* relating to a major step in the voting process— registration—the public interest can only be protected through elimination of these barriers.

*Blackwell*, 455 F.Supp.2d at 708 (emphasis in original).  Indeed, the Supreme Court has "often reiterated that voting is of the most fundamental

significance under our constitutional structure." *Ill. Bd. of Elections* v. *Socialist Workers Party*, 440 U.S. 173, 184 (1979); *see also Williams v. Rhodes*, 393 U.S. 23, 31 (1968) ("No right is more precious in a free country than that of having a voice in the election of those who make the laws under which, as good citizens, we must live.  Other rights, even the most basic, are illusory if the right to vote is undermined." (quoting *Wesberry v. Sanders*, 376 U.S. 1, 17 (1964))).  A preliminary injunction must issue.

## IV.    ORDER

For the foregoing reasons, **IT IS ORDERED**:

1.    Defendant Cheryl Johnson's Motion to Dismiss (ECF No. 9) and Defendant Hope Andrade's Motion to Dismiss (ECF No. 13) are **DENIED IN PART** to the extent specified in the foregoing opinion.

2.    The Plaintiffs' Motion for Preliminary Injunction and Accompanying Memorandum of Law (ECF No. 33) is **GRANTED IN PART** and **DENIED IN PART** as specified in the foregoing opinion.

3.    Until entry of a final judgment or until otherwise ordered, Defendants are **ENJOINED** from taking any steps to demand compliance with or enforce the following provisions:

(a)    Tex. Elec. Code Ann. § 13.038, to the extent that it prohibits lawfully appointed and trained VDRs from photocopying or scanning voter registration applications that have been submitted to a VDR but not yet delivered to the appropriate county registrar, so long as the information copied or scanned does not include the information listed as confidential under section 13.004(c) of the Texas Election Code;

(b)    Tex. Elec. Code Ann. § 13.042, to the extent that it prohibits lawfully appointed and trained VDRs from delivering submitted applications to the appropriate county registrar via U.S. mail;

(c)     Tex. Elec. Code Ann. § 13.031(d)(3), to the extent that it, by incorporating Tex. Elec. Code Ann. § 11.002(a)(5), forbids non-Texas residents from serving as VDRs;

(d)     Tex. Elec. Code Ann. § 13.038, to the extent that it prohibits lawfully appointed and trained VDRs from distributing applications to or collecting applications from residents of counties other than the county in which the VDRs are appointed and trained, and to the extent that it prohibits lawfully appointed and trained VDRs from delivering applications in person or by U.S. mail to the registrars of counties other than the county in which the VDRs are appointed and trained;

(e)     Tex. Elec. Code Ann. § 13.008(a)(2);

(f)     Tex. Elec. Code Ann. § 13.008(a)(3);

4.     This preliminary injunction binds both Defendants and each of their officers, agents, servants, employees, and attorneys—and others in active concert or participation with any of them—who receive actual notice of this preliminary injunction by personal service or otherwise.

5.     Defendant Hope Andrade is **ORDERED** to send notice of the issuance and effect of this Order by reasonable and appropriate methods to all Texas county registrars within twenty days of the docketing of this order.

6.     This preliminary injunction will take effect upon the posting of security in the amount of $100, or, if the parties so stipulate, on the filing of an undertaking by each Plaintiff in lieu of security.  The clerk must accept a cash bond or other security in this amount.  The parties must confer in good faith on substituting an undertaking in lieu of security.  Any party may move to adjust the amount of security.

**IT IS SO ORDERED**.

**SIGNED** this 2d day of August, 2012.

_____

Gregg Costa

United States District Judge